**2016 UT App 224**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DONOVAN HEATH BURNSIDE,
Appellant.

Opinion
No. 20140400-CA
Filed November 10, 2016

First District Court, Logan Department
The Honorable Clint S. Judkins
No. 111100376

Gregory N. Skabelund and Bryan Sidwell, Attorneys
for Appellant

Sean D. Reyes and Jeanne B. Inouye, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN concurred.

ROTH, Judge:

¶1      Donovan Heath Burnside appeals his convictions on three
counts of aggravated sexual abuse of a child, a first-degree
felony, under Utah Code section 76-5-404.1(4). We affirm.

BACKGROUND[1]

¶2     The victim (Child) lived with her Mother and Stepfather. Burnside, a friend of the family, lived intermittently in the household from approximately January 2009 through January 2011. In January 2011, Child told Stepfather that Burnside had touched Child's genital area. The day after this disclosure, Mother and Stepfather took Child to a doctor. After speaking with them about Child's disclosure, the doctor told them he was required to report the information to the authorities, which he did, and an investigation followed.

¶3     In the course of the investigation, a nurse practitioner at the Children's Justice Center (CJC) examined Child. Also, a CJC detective interviewed Child (the CJC Interview), which was recorded and later transcribed. During the CJC Interview, Child told the detective that Burnside had touched her genital area on multiple occasions.

¶4     The detective also separately interviewed Burnside. Burnside admitted during the interview to touching Child on three separate occasions, describing them as "inadvertent[]" or an "accident." Specifically, the detective asked Burnside, "where did you touch her?" Burnside responded by describing a time when Child had her hand in her pants, and after telling her "that she shouldn't have her hands in her pants like that," Burnside "pull[ed] [her hand] up." Burnside explained to the detective that his "hands or . . . fingers or something might have touched something down there, but I don't think that." The detective then asked "[w]hat would [your fingers] have touched," to which Burnside responded that "[i]t was probably like her leg or something down there." Burnside explained that on these

_____

1. "We view the facts in the light most favorable to the jury verdict and recite them accordingly." *State v. Montoya*, 2004 UT 5, ¶ 2, 84 P.3d 1183 (citation omitted).

occasions he did not touch Child's vagina, but only "the top of her thighs," to which the detective responded "[a]nd the top of her thighs meaning between her pelvis and the top of her thighs?" Burnside responded, "Yes." In April 2011, the State charged Burnside with three counts of aggravated sexual abuse of a child. After multiple continuances, the case eventually went to trial in July 2013.

¶5     During voir dire the State asked the panel of potential jurors, "Are there any of you who have either been a victim or have ever been accused or do you have a close friend or family member, someone close to you, who has been a victim or has been accused of sexual abuse of a child?" Several panel members raised their hands. The trial court followed up by speaking with each responding panel member in chambers in the presence of the attorneys for both sides and the defendant. These in-chambers proceedings were not recorded. The trial court eventually excused six of these potential jurors for cause. After the six were replaced from the jury pool, the State asked an almost identical question, and three more potential jurors answered affirmatively and were then questioned off the record by the trial court in chambers, again with counsel for both sides present. Following this second round of questioning, the trial court then excused one more panel member for cause. The excused juror was replaced and the same process was repeated a third time, but with no further excusals.

¶6     At trial, the State called Child, who testified that Burnside touched her vaginal area under her clothing "more than one time" when Stepfather and Mother were out of the home. On cross-examination, Child was asked about the CJC Interview and whether or not certain statements she made during the CJC Interview were "truthful." The State also called Stepfather and Mother to testify. Each of their testimonies focused on changes they observed in Child's mood before and after January 2011, when Child disclosed the alleged abuse to Stepfather. Stepfather testified that prior to January 2011 Child had been "really

happy," "excited to go to school," "doing really well [with her schoolwork]," and that she had only "infrequent" incidents of bed-wetting. He stated that after January 2011, however, her mood changed and, among other things, Child "went from [being] a really happy rambunctious kid to kind of subdued," became "physically violent" with her sibling, "did not want to go to school anymore," and "started wetting the bed every night again." Mother testified, as Stepfather had, that Child "was very happy and very spunky," but after her disclosure, Child began "having some problems with school" and became "feisty" and "really ornery" at home.

¶7   During cross-examination of Mother, Burnside's trial counsel asked a question about arguments in the home between her and Stepfather "over [Stepfather's] use of narcotics [and] marijuana." The State objected on relevance grounds and a bench unrecorded conference ensued. Following the bench conference, Burnside's counsel did not pursue the issue of Stepfather's drug use, but instead asked Mother a line of questions about Stepfather's "excessive drinking" during December 2010 and January 2011, about how during this same time Stepfather cut some of Child's toys "in half with a bandsaw" for disciplinary reasons, and inquired whether these events "would have affected [Child]." Mother agreed that they could have.

¶8   The State also called a pediatric clinical psychologist (the PTSD Expert) and a clinical neuropsychologist (the Depression Expert). The testimony from both experts focused on Child's mental state after January 2011. The PTSD Expert testified that Child's symptoms "would be representative of chronic posttraumatic stress disorder" and that PTSD in children is most commonly caused by neglect or physical or sexual abuse. The PTSD Expert was asked whether the bandsaw incident or discord in the home could explain Child's PTSD symptoms. The expert responded that Stepfather's cutting of Child's toys "would be of insufficient trauma to generate the intensity and

the length of the symptoms that [Child] . . . described," and that this incident would have been of "insufficient quality . . . to generate these same symptoms across such a variety of different times and places and persons." The PTSD Expert further testified that the verbal arguments between Mother and Stepfather did not rise to a level that would generally cause symptoms of PTSD in a child.[2] The Depression Expert testified that Child "was one of the most depressed children she had seen" because Child "felt very depressed and hopeless about everything," including her home life, school, and friends. The Depression Expert further testified that Child reported having "a lot of headaches, [and] a lot of stomachaches" and did not want to sleep alone or attend school. When the Depression Expert asked Child "directly about [the] sex abuse allegation," Child said that "she did not want to ever see [Burnside] again; she was afraid of him; and that since he had done . . . those things to her, everything had changed in her life."

¶9     The State also called the nurse practitioner who initially examined Child at the CJC and the detective who conducted the CJC Interview. The nurse practitioner testified that, when any child is referred to the CJC, she "obtain[s] a medical history from the parents" before speaking with the child and "ask[s] [the child] if they know why they are [at the CJC]" before conducting a physical examination. The nurse practitioner testified that she initially asked Child questions to determine if Child knew why

---

2. When asked about "fighting" and "quarreling" in the home, the PTSD Expert testified that, in her experience, cases where fighting or quarrelling in the home causes PTSD, "[t]he nature of the parents' behavior was sufficient to warrant [that] both parents be incarcerated. It involved shedding of blood. It involved very personal obscenities. It occurred over a course of many months, and the child was eventually removed from the home due to the severity of the parents' behaviors."

she was at the CJC and then "proceeded . . . to talk about what a good touch is and what a bad touch is." When asked "if anybody ha[d] done any bad touches [to Child]," Child responded, "Yes, . . . [Burnside] had," and then Child "pointed to her private area." When asked where the conduct had occurred, Child stated that it had happened in her bedroom or her sibling's bedroom on multiple occasions. The nurse practitioner testified that she physically examined Child, with Mother present, "from head to toe and checked her genital area" and that "[Child's] examination was normal." The nurse practitioner indicated, however, that such a finding would be "consistent" with Child's earlier statements. The detective testified about her investigation of Child's allegations against Burnside. During the detective's direct examination, the State played the CJC Interview in its entirety to the jury; Burnside objected only to the quality of the recording.

¶10    Burnside's counsel called three witnesses: Burnside's girlfriend at the time of Child's disclosure, Child's biological father, and Burnside himself. Burnside's former girlfriend testified about her relationship with Burnside, as well as Mother and Stepfather's lack of treatment for an ongoing condition that Child had in her genital area that resulted in what the family called "spicy pee." Specifically, the former girlfriend recounted that she had a conversation with Burnside and Mother in September 2010 about Child's medical condition and "how it's supposed to be taken care of" with "a cream [that Mother] was supposed to have for [Child]." She further testified that, in the "whole time" she knew Mother and Stepfather, she "never saw [the cream]" or "any medication" for the condition in the house. The former girlfriend also described her recollection of an encounter where Mother and Stepfather confronted Burnside about Child's disclosure to Stepfather.

¶11    Child's biological father testified about Child's ongoing medical condition, a urinary tract infection, and conversations he had had with Burnside and Mother with respect to Child's

infection. Burnside testified about how he came to live in the same house as Child and about the three instances where he "had done anything with regard to inspection of the private area of [Child]." Burnside testified that in the spring of 2010 Mother had taken Child out of the bathtub and dried her off and then "asked [Burnside] to put a diaper on her and help her get some clothes," and that it was during this time that he "noticed [Child's vaginal area] was red." He also testified that at one point he walked by the doorway of Child's room and noticed that "her hand was in her pants, and that's when [he] realized she was scratching." He responded by telling Child that "she should not be scratching, that it could make it worse and not to do it," and then he "pulled" her hand out of her pants.

¶12    Burnside further testified that, in January 2011, he was in his bedroom and Child came into the room "to get [him] for breakfast." He noticed that Child "smelled like urine" so he "pulled her pants [a]way from her body" (although he "never even looked in her pants") before telling Child to leave the room and go wash her hands. Trial counsel also asked Burnside about his interview with the detective and how the detective "frequently [used] the term 'vaginal area'" during the interview. Counsel stated: "Would you tell the jury what in your mind was being addressed by the term 'vaginal area'?" Burnside responded that the term "vaginal area," as he used it during the interview, "didn't [only] mean the clitoris or the pee area" but—as he indicated in the interview—referenced "the top of her thighs." He stated that, "[if] there had ever been any time" that he touched Child on her body in what the detective "referred to . . . [as] 'the vaginal area'," "then it would have been by accident."

¶13    The jury convicted Burnside on all three counts of aggravated sexual abuse of a child, and the trial court sentenced him to concurrent prison terms of six years to life on each count. After trial, Burnside obtained new counsel and filed a motion to arrest judgment. The motion raised various claims of ineffective

assistance of counsel and alleged several other errors by the trial court that are pertinent to this appeal. First, Burnside asserted he received ineffective assistance from his trial counsel in three respects: counsel "failed to subpoena a material witness"; "did not timely request fund[s] for trial experts"; and "did not object to inadmissible evidence." Second, Burnside asserted that the trial court erred: (1) by failing to record and preserve a record of the in-chambers discussions during voir dire and a bench conference; (2) by preventing trial counsel from adequately questioning Child's biological father about whether Child was unhappy before Burnside lived in the home; (3) by preventing counsel from asking Mother during cross-examination about Stepfather's drug abuse, which Burnside claimed to have impaired his ability to "present relevant evidence that supported his theory of the case"; (4) by allowing the nurse practitioner's hearsay testimony as "an exception to the hearsay rule under statements for purposes of medical diagnosis or treatment"; and (5) by allowing the State to play the recording of the CJC Interview during the detective's testimony in violation of Burnside's due process rights.

¶14    The trial court held an evidentiary hearing in February 2014 on the motion to arrest judgment. Burnside called only one witness, his trial counsel. Burnside's trial counsel testified that, based on his experience, he "assumed" the in-chambers discussions with jurors during voir dire would be recorded as well as any bench conferences. He also testified that he had inquired at trial about drug use by Child's parents and Child's home life because he considered it "significant" "to show the condition and the trauma that may have existed at the time . . . would have led to trauma in the child other than the alleged abuse."

¶15    Burnside also pressed his claims of trial counsel's ineffective assistance, specifically questioning counsel about why he did not subpoena a particular witness and why he did not request funding for an expert witness. Regarding the subpoena,

Burnside's trial counsel testified that the witness, a doctor who had previously treated Child, was "no longer associated" with the medical facility where Child had been treated and therefore he felt evidentiary problems may have arisen when trying to introduce Child's pertinent medical records. Further, trial counsel testified that he believed that he "could [still] try to get [the records] in through [Mother]." Additionally, he testified there was "no money . . . available . . . for . . . discovery purposes and getting experts" because, although Burnside's family had initially stated that they would make funds available for an expert, they later—at a point close to trial—"informed [counsel] there would be none."

¶16    Following the evidentiary hearing, the trial court issued a memorandum decision and order addressing in some detail most of the issues Burnside now raises on appeal and denying Burnside's motion to arrest judgment. Burnside appeals.

ISSUES AND STANDARDS OF REVIEW

¶17    Burnside raises multiple claims, generally under the rubric of plain error or ineffective assistance of counsel. Burnside contends that the trial court plainly erred by sustaining two of the State's objections, thereby preventing him from presenting relevant evidence; by allowing hearsay testimony from the nurse practitioner; by permitting the CJC Interview tape to be played to the jury; and by failing to "properly record the proceedings in order for an adequate record to be preserved." With respect to Burnside's claims about failure to record the proceedings, the nurse practitioner's hearsay testimony, and the playing of the CJC Interview tape, he claims, alternatively, that his trial counsel provided ineffective assistance either by "not preserving a record" or by not objecting. In addition, Burnside argues that his trial counsel performed ineffectively by failing to subpoena a material witness, Child's former doctor, who Burnside claims would have given testimony "that would support [his] theory of

the case," and was also ineffective by not timely requesting funds for a trial expert.

¶18   "In a situation such as this, in which the trial court has previously held an evidentiary hearing on a motion based on ineffective assistance of counsel, such a claim presents a mixed question of law and fact." *State v. Perry*, 899 P.2d 1232, 1238 (Utah Ct. App. 1995) (citing *Strickland v. Washington*, 466 U.S. 668, 698 (1984)). "Accordingly, Utah's appellate courts have deferred to the trial court's findings of fact, but review its application of the appropriate legal principles to its factual findings for correctness." *Id.* (citing *State v. Hay*, 859 P.2d 1, 4–5 (Utah 1993)). Here, because Burnside has previously raised the issues on appeal in his motion to arrest judgment, we review them as mixed questions of fact and law—we review the district court's factual findings for clear error and its legal conclusions for correctness. *See also State v. Templin*, 805 P.2d 182, 186 (Utah 1990).

ANALYSIS

¶19   "Appellate courts generally will not consider an issue raised for the first time on appeal absent plain error, exceptional circumstances, or ineffective assistance of counsel." *State v. Floyd*, 2014 UT App 53, ¶ 6, 321 P.3d 1170. Because the issues Burnside raises on appeal were not preserved during the trial itself, Burnside invokes the plain error and ineffective assistance of counsel exceptions to the preservation rule. "[T]o establish the existence of plain error . . . , the appellant must show the following: (i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). And to establish his claim of ineffective assistance of counsel, Burnside "must show that [his] counsel's performance was deficient" and that "the deficient performance

prejudiced the defense." *Strickland*, 466 U.S. at 687. Because Burnside must establish both elements in order to prevail on a claim of ineffective assistance, "a failure to prove either element defeats the claim." *State v. Hards*, 2015 UT App 42, ¶ 18, 345 P.3d 769.

### I. Claims Related to Burnside's Theory of the Case

¶20 Burnside contends that the trial court plainly erred because Burnside "was not allowed to present relevant evidence that supported his theory of the case." Specifically, he asserts that it was "error for the court not to allow [him] to introduce other events that may have caused [Child's] PTSD and/or depression" while "the State was allowed to fully develop its theory with multiple witnesses and experts." In this regard, Burnside asserts that Child "was not happy" and was "neglected" even before the abuse allegations and that "[t]his was witnessed by at least one medical doctor and her biological father." He also asserts that "if [Child] was suffering from PTSD, then it was caused by other events in the child's life, such as the abuse, neglect, drinking and drug use of the step-father and neglect of the mother," evidence he claims that he was prevented from fully presenting to the jury. Burnside argues that errors by the trial court in sustaining two of the State's objections, together with his counsel's failure to "subpoena a necessary witness," and his failure to "timely request funds for an expert witness" essentially prevented Burnside from presenting his theory of the case.

A.    The State's Objections

¶21 Burnside asserts that he was prevented from establishing that any behavior and mood problems Child exhibited predated the alleged sexual abuse. Burnside focuses on two evidentiary rulings by the trial court that he argues were in error: (1) cutting off his examination of Child's biological father about whether Child "suffered from a medical condition long before her contact

with Burnside"; and (2) preventing his cross-examination of Mother about Stepfather's alleged drug use. In its memorandum decision following the motion to arrest judgment, the trial court concluded that Burnside had an adequate opportunity to present evidence in support of his theory. The court found that at trial Burnside had "presented evidence suggesting [Child]'s PTSD was a result of something other than sexual abuse" and that Burnside had "demonstrated" that "there was fighting in the home," that Stepfather had used a bandsaw to cut Child's toys, and that Child had sustained a broken leg and was "suffering from a chronic rash." The court concluded that, as a result, "the jury was given an opportunity to consider Mr. Burnside's theory" that Child's change in mood and behavior had been the result of turmoil in the home and her health issues rather than sexual abuse, "but ultimately chose to reject it in comparison to other evidence, namely Mr. Burnside's own admissions." On appeal, Burnside does not engage with the trial court's reasoning, often failing to even acknowledge that the trial court considered his arguments and made detailed rulings. We agree with the trial court that Burnside has not shown that the court's evidentiary rulings wrongfully impeded his opportunity to present his defense.

1.      Direct Examination of Biological Father

¶22   During Burnside's direct examination of Child's biological father, trial counsel asked, "how did you learn about [Child's] medical condition," to which the witness responded that he had "known about [it] . . . for quite some time." Trial counsel asked, "[s]tarting when," and the witness responded:

> When she was, I want to say, six months to a year old, me and my wife at the time were documenting when she would come over for weekends—she would constantly come over with diarrhea, severe diaper rash to the point that we couldn't change

> her without hurting her. We couldn't bathe her
> without her crying.

The State objected, stating that "what happened when she was six months to a year old" is not "relevant to why we're here today." The district court responded, "[t]hat very well may be," but then directed the witness to "[j]ust respond to the question" and not continue "with additional narrative." Child's biological father responded to the original question and testified that he "discovered [Child's medical condition] when she was very young." Trial counsel then went on to briefly establish, without interruption from the State or the court, that the biological father was aware the medical condition persisted during the years when he was later serving in the military.

¶23    Burnside seems to argue that the court's instruction to the witness to "[j]ust respond to the question" is equivalent to the court having sustained the State's objection and therefore, according to Burnside, "the trial court did not allow this line of questioning." Burnside then argues that "[t]his evidence is relevant because it rebutted the testimony of [Mother] and [Stepfather] that [Child] was happy and had a pleasant childhood. It showed that [Child] was suffering from a medical condition long before Burnside lived in the house. Further, it showed that [Child] was unhappy for years." But in response to the State's relevance objection, the trial court did not rule that the evidence was irrelevant or place any restrictions on trial counsel's questions. Rather, the court merely told the witness to avoid giving narrative testimony—to respond to trial counsel's specific question but not volunteer additional information. Thus, there was nothing in the court's response that prevented trial counsel from continuing that line of inquiry had he believed it was important. But counsel apparently did not think it important to focus further on Child's condition in early childhood, and instead moved on to questions about the biological father's visits with Child as she grew older and his observations of her ongoing medical condition at a time closer to

the events in question. As a consequence, Burnside has failed to identify any error by the court, much less an obvious one. *See Dunn*, 850 P.2d at 1208 (noting that the showing of plain error requires that "[a]n error exists" and that "the error should have been obvious to the trial court").

¶24 Moreover, the record reveals that the jury heard substantial evidence from other witnesses that Child had suffered from a painful rash when she was very young and that the rash had continued to trouble her both before and after the alleged sexual abuse. For example, the biological father's testimony both before and after the court's comment to "[j]ust respond to the question" established that Child had a painful rash beginning at a very young age, and Mother had already testified that Child began complaining of pain caused by the rash "around two," which caused Mother to seek help from "a specialist." Stepfather had also testified that when Child was "[p]robably five," he and Mother had taken Child to "several specialists," one who prescribed an ointment, but that Child still would "whine a lot if she had to urinate" because it "stung when she urinated."

¶25 Thus, Burnside has not persuaded us that the trial court erred in its response to the State's objection or, even if it did, that Burnside's presentation of his case was prejudiced. *See State v. Norton*, 2003 UT App 88, ¶ 24, 67 P.3d 1050 (concluding that it was not an abuse of discretion when the trial court did not allow the defendant to provide "further testimony," which the court determined was among other things, "cumulative").

2.    Cross-Examination of Mother

¶26 During cross-examination, trial counsel asked Mother whether she and Stepfather had "arguments . . . over [Stepfather]'s use of narcotics, [and] marijuana." The State objected on relevance grounds, and the court called both counsel to the bench. The recording of the bench conference was cut

short after trial counsel's statement that "[t]he relevance is I'm going to introduce into evidence . . . ." The court apparently sustained the objection, however, because following the bench conference, trial counsel did not pursue questions about Stepfather's drug use. Counsel instead asked questions regarding "significant arguments" between Mother and Stepfather that Mother conceded had occurred, and Mother ultimately agreed that these arguments "would have affected" Child.

¶27 Burnside argues that the trial court should have allowed trial counsel to question Mother about Stepfather's drug use. Burnside asserts that "the adverse effects of [Child's] step-father's drug use, criminal arrest and the stress these activities were causing in the home" were part of the environment of "abuse and neglect [by] her step-father and mother," rather than sexual abuse, that could have caused any "change in [Child's] behavior." But he provides no more than conclusory statements about drug use on Stepfather's part without identifying any basis in fact for those allegations. *Cf. State v. Emmett*, 839 P.2d 781, 786–87 (Utah 1992) ("Generally, it is error to ask an accused a question that implies the existence of a prejudicial fact unless the prosecution can prove the existence of the fact. Otherwise, the only limit on such a line of questioning would be the prosecutor's imagination." (footnote omitted)). Nor is there any indication that during the bench conference trial counsel proffered that he would establish an appropriate factual foundation for such questions. And without factual support for this claim, we can do no more than speculate that, had the trial court allowed questioning regarding Stepfather's alleged drug abuse, that "there [would be] a reasonable likelihood of a more favorable outcome." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993); *see generally State v. Kirkwood*, 2002 UT App 128, 47 P.3d 111 (explaining that speculative assignments of error unsupported by the record do not constitute grounds for reversal).

¶28    Indeed, even if Burnside had established that Stepfather and Mother argued about Stepfather's alleged drug use, we are not persuaded that the outcome would have changed. As we have discussed, Burnside presented substantial evidence supporting his position that Child's PTSD was a result of something other than sexual abuse. Specifically, trial counsel elicited testimony that there were arguments in the home between Mother and Stepfather that Mother agreed would have affected Child, that Stepfather cut some of Child's toys in half with a bandsaw to discipline her, that Child had broken her leg, and that she was suffering from a chronic rash that long predated Burnside's arrival in the house. He has not persuaded us that further specifying the cause of some of the marital discord in the house as related to Stepfather's drug use would have changed the outcome.

¶29    Accordingly, we conclude that Burnside has not demonstrated that the trial court erred when it sustained the State's objection to Mother's question.

B.    The Former Doctor's Testimony

¶30    Burnside argues on appeal that his trial counsel was ineffective for failing to subpoena Child's former doctor to testify about Child's preexisting medical condition in order to counter the State's claim that Child's PTSD stemmed from sexual abuse. Burnside alleges that this former doctor could have testified about a medical appointment with Child during which she was so upset by the effects of her rash that he could not complete his examination. According to Burnside, the testimony of Child's former doctor was necessary to show that Child "had been a very unhappy child long before Burnside was in her life." But Burnside has provided no more than conclusory statements about what the doctor would have said at trial had he been called. Although the trial court held an evidentiary hearing on Burnside's motion to arrest judgment, Burnside presented no evidence even identifying the doctor, much less showing what

the doctor's testimony would have been if called. Nor has he sought a remand under appellate rule 23B to develop an appropriate record.[3]

¶31    Instead, Burnside cites *State v. Templin*, 805 P.2d 182 (Utah 1990), for the proposition that trial counsel's performance was deficient under *Strickland* "because [he] did not make a reasonable investigation into the possibility of procuring [a] prospective defense witness[]." We have previously discussed *Templin* in the context of whether an attorney's failure to investigate potential witnesses prejudiced a defendant. In *State v. Curtis*, 2013 UT App 287, 317 P.3d 968, we stated:

> In *Templin*, the Utah Supreme Court reversed a rape conviction because defense counsel failed to interview a witness "who would have testified that she saw defendant and the victim kissing passionately for over fifteen minutes . . . at the address of and within an hour of the rape reported by the victim." This testimony, the court noted, would have contradicted the victim's testimony, which was "the only direct evidence of [the defendant's] guilt." But the court also mentioned in a footnote that failing to interview and call another witness was not ineffective assistance because even though the defendant "provided . . . an affidavit stating that [the witness] was never contacted by trial counsel," he did not provide "any evidence concerning what [the witness] would have testified

---

3. Rule 23B permits entry of additional findings of fact under certain circumstances: "A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a).

to . . . [at] trial." "Therefore," the court held, the defendant could not show "a reasonable probability that the result of his trial would have been different" had the witness testified.

*Id.* ¶ 40 (alterations and omissions in original) (citations omitted). Like Templin, Curtis asserted that his attorney "was aware of other potential witnesses," but that he "failed to investigate and interview [them]." *Id.* ¶ 41 (citation and internal quotation marks omitted). But, like Templin, Curtis gave "no description" regarding what one of the witnesses "would have testified to at trial," and his description of the potential testimony of the other witness was limited to "a single line" from an affidavit. *Id.* ¶ 42. In denying Curtis's request for remand under rule 23B of the Utah Rules of Appellate Procedure, we stated that "[e]ven were we to assume that trial counsel failed to interview both witnesses, Curtis has not shown that he was prejudiced." *Id.* ¶ 42. We concluded that,

> Without nonspeculative evidence establishing what each witness could have testified to at trial, Curtis has not shown that any deficient performance by trial counsel in failing to interview them was "so serious" that it "deprive[d] [him] of a fair trial," and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.]"

*Id.* ¶ 42 (alterations in original) (quoting *State v. Lenkart*, 2011 UT 27, ¶ 38, 262 P.3d 1).

¶32   Burnside's claim suffers from the same deficiencies. Even if trial counsel acted unreasonably in failing to ensure the doctor was available to testify at trial, by failing to identify the doctor and present nonspeculative evidence—more than a simple proffer—of what he would have testified to if called, Burnside

has failed to demonstrate that trial counsel's deficiencies were "so serious that [he was] deprive[d] . . . of a fair trial." *See id.* (second alteration in original) (citation and internal quotation marks omitted); *State v. Hales*, 2007 UT 14, ¶ 51, 152 P.3d 321 ("If a defendant claims prejudice because a certain document or a previously available witness is now missing or unavailable, the defendant must provide the 'expected content' of the document or the witness's testimony and indicate how that document or witness would have aided the defense."). The importance of the requirement for more than just conclusory statements about a witness's likely testimony is underscored in this case because, as the court noted, "Mr. Burnside's trial counsel confirmed during oral argument he had explored [the] theory during trial." Indeed, as we have discussed in more detail above, considerable evidence about Child's medical condition was presented at trial. As the district court found, other witnesses testified that Child was suffering from a recurring rash and there was additional evidence to support Burnside's theory that her PTSD could have been caused by factors unrelated to sexual abuse, including serious discord in the home, disturbing parental discipline, and Child's chronic rash.

¶33 Without providing concrete information identifying Child's former doctor and his potential testimony, Burnside cannot persuade us that the trial court was wrong in its conclusion that the doctor's purported testimony about a single incident regarding Child's rash "would merely be cumulative and reaffirm what the jury already knew." In other words, by failing to demonstrate that "the evidentiary picture and the inferences drawn therefrom would not have been significantly different" if trial counsel had called this unidentified doctor and if the doctor would have testified as Burnside now asserts that he would have, Burnside has failed to demonstrate that any error of counsel prejudiced him. *See State v. Idrees*, 2014 UT App 76, ¶ 16, 324 P.3d 651 (internal quotation marks omitted)); *see also Strickland v. Washington*, 466 U.S. 668, 694 (1984) (explaining that

in order to demonstrate that counsel's error prejudiced the defendant, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different").

C.      Expert Witness Funding

¶34   Burnside also contends that his trial counsel was ineffective for not timely requesting funding for an expert witness to counter the State's PTSD Expert. On appeal, Burnside's entire argument on this issue is as follows:

> Burnside's attorney knew that an expert was necessary to assist him in preparing for a complete and adequate defense. However, he did not make timely preparation to hire an expert to get funds from the county to pay for such expert services.
>
> The State of Utah gave Burnside notice that it intended to call several witnesses. Burnside's attorney knew that a necessary part of the defense would be to call his own expert that could testify consistent with Burnside's theory of the case. On or about July 11, 2013, Burnside's attorney filed a Motion for Funds for Experts and Private Investigator. The motion was denied because it was not timely. Consequently, Burnside had no witness to rebut the State's expert witnesses, especially [the PTSD Expert].

(Citations omitted.)

¶35   The briefing on this issue is inadequate because it does not "contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes, and parts of the record relied on." Utah R. App. P. 24(a)(9). These conclusory statements are insufficient to establish that trial counsel failed to meet the standards for

reasonable representation or, if he did, how he prejudiced Burnside. *See Allen v. Friel*, 2008 UT 56, ¶ 24, 194 P.3d 903 (concluding that defendant inadequately briefed his claim of ineffective assistance because, among other things, defendant "did not offer any analysis of whether these actions [by counsel] were objectively deficient or describe how they prejudiced his defense if they were"); *see also State v. Singh*, 2011 UT App 396, ¶ 4, 267 P.3d 281 (declining to address defendant's inadequately briefed arguments because defendant "fail[ed] to provide supporting record citations, . . . ma[de] conclusory statements about the elements of his ineffective assistance of counsel claims, and fail[ed] to develop the legal authority that support[ed] his arguments" (footnotes and citation omitted)). Indeed, with regard to *Strickland*'s prejudice prong, Burnside fails to acknowledge—much less analyze and refute—the trial court's decision that he had failed to demonstrate prejudice from any claimed deficiency in trial counsel's performance.

¶36 At the evidentiary hearing, the court heard testimony from Burnside's trial attorney. Trial counsel testified that he had spoken with two experts about Burnside's case, but ultimately the funding, which had previously been assured by Burnside's family, was not made available. Trial counsel testified he therefore filed a motion asking the trial court to make funding available for an expert witness, which the trial court denied as being untimely. In its ruling on Burnside's motion to arrest judgment, the trial court found that,

> Mr. Burnside fail[ed] to show how [his trial counsel's] failure to request funding for trial experts fell below [*Strickland*'s] objective standard. The only witness called during the evidentiary hearing was [Burnside's trial counsel]. In order to sufficiently support his ineffective assistance of counsel claim, Mr. Burnside would need to call an additional witness, or present some other satisfactory evidence, demonstrating that expert

testimony would be essential to his defense. Without that evidence for comparison, the Court cannot evaluate the likelihood the trial proceeding would have been any different. The Court cannot simply take Mr. Burnside's word alone.

¶37    The trial court concluded that "[e]ven if the Court were to determine the alleged errors fell below *Strickland*'s objective standard, Mr. Burnside has failed to demonstrate how those errors would have changed the result of the proceeding, especially in light of Mr. Burnside's own admission to touching [Child] in her vaginal area."

¶38    We agree with the trial court. Neither in the trial court nor on appeal[4] has Burnside identified any expert that his trial counsel should have called or established what such an expert's testimony would have been. As a consequence, even if we assume that trial counsel's failure to timely move the court for expert witness funding was unreasonable, Burnside has not shown prejudice. He has not identified an expert or shown what that expert would have testified to that would have been reasonably likely to make a difference in the outcome, nor has he shown how a particular expert's advice to counsel would have resulted in more effective cross-examination of the State's expert witnesses. Accordingly, Burnside's claims of ineffective representation are speculative, and "proof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." *Fernandez v. Cook*, 870 P.2d 870, 877 (Utah 1993); *see also State v. Millard*, 2010 UT App 355, ¶ 31, 246 P.3d 151 ("Neither speculative claims nor counsel's failure to make futile objections establish ineffective assistance of counsel."

---

4. As we have noted, Burnside did not file a motion for remand to the trial court "for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a).

(citation and internal quotation marks omitted)). "Without nonspeculative evidence establishing what each witness could have testified to at trial, [Burnside] has not shown that any deficient performance by trial counsel in failing to [obtain funding for a trial expert] was so serious that it deprived[d] [him] of a fair trial, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Curtis*, 2013 UT App 287, ¶ 42, 317 P.3d 968 (third and fourth alterations in original) (citation and internal quotation marks omitted).

## II. Burnside's Remaining Claims

¶39     Burnside raises three other issues, claiming all three were plain error by the trial court. He claims two issues amounted to ineffective assistance of counsel as well. He contends that the court should have stricken the "entire testimony" of the nurse practitioner as "inadmissible hearsay" and that trial counsel should have objected to her testimony; that the court should not have allowed the State to play Child's CJC Interview during the detective's testimony because Child was thereby "allowed to testify twice during the trial"; and that "[t]he court did not properly record the proceedings in order for an adequate record to be preserved," an error abetted by trial counsel's own failure to ensure that a proper record was made.

### A.     The Nurse Practitioner's Testimony

¶40     Burnside contends that it was plain error for the trial court to allow the nurse practitioner's testimony to be presented to the jury because it was inadmissible hearsay. He also argues that his counsel was ineffective for failing to object to her testimony. Burnside asserts on appeal, just as he did in his motion to arrest judgment, that the nurse practitioner was "acting as a de facto law enforcement officer and not a medical health professional" and therefore her testimony did not qualify

for admission under the hearsay exception for a statement made for purposes of medical diagnosis or treatment.

¶41    In its memorandum decision, the district court ruled that it was not plain error to allow the nurse practitioner to testify because her testimony "was admissible as an exception to the hearsay rule because the statements were pertinent to medical diagnosis or treatment."[5] Utah R. Evid. 803(4). In support of this conclusion, the court found that the nurse practitioner "testified that as part of her employment she conducts medical evaluations on children" to ensure their health, safety, and well-being; that she was seeing Child due to a report of a "bruise inside her genital area"; that "a head-to-toe physical examination" was completed to "determine if [Child] had suffered injuries"; and that the questions asked by the nurse practitioner were to "determin[e] whether [Child] displayed symptoms of having been sexually abuse[d] and to determine if she required medical treatment." Additionally the court "decline[d] to consider Mr. Burnside's plain error argument because it appear[ed] he actively waived any objection as a matter of trial strategy." The court stated in its ruling:

> During cross-examination, [the nurse practitioner] was asked whether or not she had inquired if anyone had "suggested bad or good touch terminology" to [Child] prior to the examination.

---

5. A statement made for medical diagnosis or treatment falls within an exception to the hearsay rule if the statement "(A) is made for—and reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." Utah R. Evid. 803(4). Additionally, "a statement by a child to a parent for purposes of obtaining medical assistance would probably qualify as well." R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 806 (2014).

> [The nurse practitioner] testified that others had indeed talked to [Child] about good and bad touch. Mr. Burnside appears to have elicited the information in order to support an overarching defense theory that [Child's] statements may have been improperly influenced by outside sources. Thus, the Court was not called upon to make a determination as to admissibility because Mr. Burnside decided to use the information in support of his defense.

(Citation omitted.)

¶42   On appeal, Burnside again argues that "it was plain error to admit [the nurse practitioner's] testimony" and that his counsel acted deficiently in not objecting to it. But an attorney's decision to forgo an objection as a matter of trial strategy cuts strongly against a finding of either plain error or ineffective assistance of counsel. *See State v. Clark*, 2004 UT 25, ¶ 7, 89 P.3d 162 (concluding that trial counsel's failure to object to testimony was not ineffective assistance because it could have been part of a reasonable strategy); *State v. Morgan*, 813 P.2d 1207, 1211 (Utah Ct. App. 1991) (refusing to consider the merits of appellant's plain error argument because "it was within counsel's professional discretion to not object to testimony that would aid [trial] strategy"). Burnside has failed to address (or even acknowledge) the trial court's decision on this issue. *See Allen v. Friel*, 2008 UT 56, ¶ 4, 194 P.3d 903 (recognizing that the appellant has the obligation to challenge the basis of the trial court's decision and the burden to show error in that decision).

¶43   Nor has Burnside attempted to show that the court's factual findings in support of its decision were clearly erroneous. *See R.B. v. L.B.*, 2014 UT App 270, ¶ 26, 339 P.3d 137 ("An appellant challenging a finding of fact bears the heavy burden of demonstrating that the finding is clearly erroneous and must do so by showing that the finding is without adequate evidentiary support or was induced by an erroneous view of the law."). In

particular, he has not challenged the court's factual findings that support a conclusion that in examining Child, the nurse practitioner was acting as a health-care professional and that Child's statements to her fell within the medical treatment hearsay exception. Nor has he challenged the trial court's finding that his trial counsel had a strategic basis for not objecting to the nurse practitioner's testimony. As a consequence, we are not persuaded either that the trial court committed plain error or that trial counsel acted contrary to reasonable professional standards in allowing nurse practitioner to testify as she did. *See Morgan*, 813 P.2d at 1211.

B.    The CJC Interview

¶44    Burnside next contends that the trial court plainly erred by permitting the State to play the CJC Interview for the jury during the detective's testimony, when Child had already testified. Burnside asserts that "once the victim testified, the State of Utah [could not] use the video as a sword and have the ability to testify twice." Burnside notes that "[r]ules of evidence prohibit the admissibility of repetitive and cumulative evidence" and argues that permitting the CJC Interview to be played after Child had already testified "place[d] an undue emphasis" on her "testimony over other witnesses." (Citing Utah R. Evid. 611(a).)

¶45    At the end of the first day of trial and after the jury was excused, the trial court asked each side to state how long they expected the presentation of any additional witnesses to take. It was at this point that the State responded, "I guess the final witness is going to be the detective, and the longest part of her testimony is going to be playing the approximately hour-long tape of [Burnside's] interview and possibly playing an 18-minute clip of [the CJC Interview]. That's our case." Burnside's trial counsel responded, "We can still stipulate to that [CJC Interview] testimony." To which the State replied, "Yeah, I think we're going to move to admit the CJC tape."

¶46    In its decision on the motion to arrest judgment, the trial court concluded that it "need not determine whether or not the admission of the video in addition to [Child's] live testimony was plain error because Mr. Burnside stipulated to its use at trial." The court went on to explain that it "will not entertain a plain error argument when Mr. Burnside stipulated to the very error he claims denied him of due process." Further, the court found that the stipulation was "a strategic choice," because

> prior to the video even being shown to the jury, Mr. Burnside's trial counsel cross-examined [Child] and tried to elicit inconsistencies by referencing the video interview. Mr. Burnside cannot now reverse his position after a verdict has been rendered against him and argue it was plain error for the Court to allow the video.

We agree with the trial court.

¶47    First, trial counsel invited any error by stipulating to admission of the CJC Interview. Accordingly, plain error review is not available to Burnside for this claim. *See State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 ("[U]nder the doctrine of invited error, we have declined to engage in even plain error review when 'counsel, either by statement or act, affirmatively represented to the [trial] court that he or she had no objection to the [proceedings].'" (second and third alterations in original) (quoting *State v. Hamilton*, 2003 UT 22, ¶ 54, 70 P.3d 111)).

¶48    And even if Burnside were entitled to plain error review, he has failed to prove that any error that might have occurred was obvious. *See State v. Low*, 2008 UT 58, ¶ 20, 192 P.3d 867 ("To prevail under plain error review, a defendant must demonstrate that [1] an error exists; [2] the error should have been obvious to the trial court; and [3] the error is harmful . . . ." (alterations in original) (citation and internal quotation marks omitted)). As we have noted, the trial court found that counsel had used the video

to demonstrate inconsistencies between Child's testimony and her prior statements at the CJC: "[P]rior to the video even being shown to the jury, Mr. Burnside's trial counsel cross-examined [Child] and tried to elicit inconsistencies by referencing the video interview." The court therefore found that counsel's failure to object was not simply an inadvertent omission, but "a strategic choice," a finding that Burnside has not challenged on appeal. It is not obvious error for a court to decline to intervene where there is a plausible strategic basis for counsel's decision to refrain from objecting to given evidence. *See State v. Bedell*, 2014 UT 1, ¶ 26, 322 P.3d 697 ("A district court is not required to constantly survey or second-guess [a] nonobjecting party's best interests or trial strategy and is not expected to intervene in the proceedings unless the evidence would serve no conceivable strategic purpose." (alteration in original) (citation and internal quotation marks omitted)); *State v. Hall*, 946 P.2d 712, 716 (Utah Ct. App. 1997) ("We . . . will decline to consider a defendant's plain-error arguments if the alleged errors reasonably resulted from defense counsel's conscious decision to refrain from objecting, or if defense counsel led the trial court into error." (citation and internal quotation marks omitted)); *see also State v. Brown*, 948 P.2d 337, 343 (Utah 1997) ("If trial counsel intentionally fails to object, the trial judge is put in the untenable position of deciding whether to intervene and potentially interfere with trial counsel's strategy or face review for plain error.").

¶49 Accordingly, we conclude that Burnside has not demonstrated that the trial court plainly erred in permitting the State to play the CJC Interview for the jury during the examination of the detective.[6]

---

6. Burnside asserts in the Statement of Issues section of his opening brief that his trial counsel's failure to object to the playing of the CJC Interview constituted ineffective assistance of

(continued…)

C.     The Inadequate Record

¶50     Burnside finally contends that the trial court erred when it "did not properly record the proceedings in order for an adequate record to be preserved" of the in-chambers voir dire of individual jurors and of a bench conference following the State's objection to trial counsel's question to Mother about Stepfather's alleged drug use. As these issues were not preserved by objection during the trial itself, Burnside asks us to consider his claims under the plain error and ineffective-assistance-of-counsel exceptions to the preservation rule. *See State v. Floyd*, 2014 UT App 53, ¶ 6, 321 P.3d 1170 ("Appellate courts generally will not consider an issue raised for the first time on appeal absent plain error, exceptional circumstances, or ineffective assistance of counsel.").

¶51     There can be no question that the trial court erred in this respect. The responsibility of a trial court in what is expressly designated a court of record to ensure that proceedings are

---

(…continued)

counsel as well as plain error on the part of the trial court. But Burnside fails to mention an ineffective assistance claim in his argument on this issue. Thus, this claim must fail. *See Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 ("An appellate court is not a depository in which [a party] may dump the burden of argument and research." (alteration in original) (citation and internal quotation marks omitted)); *see also* Utah R. App. P. 24(a)(9). But even if we were to address it, our discussion of the trial court's determination that trial counsel had a strategic basis for admitting the CJC Interview applies equally to any claim that counsel was ineffective for failing to object. *See State v. Tennyson*, 850 P.2d 461, 468 (Utah Ct. App. 1993) (recognizing that "authority from this court supports the notion that an ineffective assistance claim succeeds only when no conceivable legitimate tactic or strategy can be surmised from counsel's actions").

properly recorded is a point we made in the first year of this court's existence. *Briggs v. Holcomb*, 740 P.2d 281, 282–83 (Utah Ct. App. 1987). Since then, we have repeated time and again that all district court proceedings must be recorded, a precept that applies to conferences in chambers and at the bench, not just to more formal proceedings in open court. *State v. Suarez*, 793 P.2d 934, 936 n.3 (Utah Ct. App. 1990); *see also Birch v. Birch*, 771 P.2d 1114, 1116 (Utah Ct. App. 1989) ("As we have previously held, a record should be made of *all* proceedings of courts of record."). In addition, though maintaining a record is primarily the obligation of the court, arguably trial counsel also has some responsibility to ensure that court proceedings are properly recorded to facilitate an effective appeal. *Cf. State v. Litherland*, 2000 UT 76, ¶ 16, 12 P.3d 92 ("[W]here, on direct appeal, defendant raises a claim that trial counsel was ineffective . . . , defendant bears the burden of assuring the record is adequate.") Thus, the failure to ensure a complete record of proceedings meets the standard for obvious error by the trial court and could amount to deficient performance by counsel, as well. Nevertheless we conclude that Burnside has not met his burden on appeal to show prejudice. *See State v. Garcia*, 2016 UT App 59, ¶ 29, 370 P.3d 970 ("Because both deficient performance and prejudice are requisite elements of a claim of ineffective assistance of counsel, failure to prove either element necessarily defeats the claim.").

¶52    During voir dire, the State asked all potential jurors: "Are there any of you who have either been a victim or[,] have ever been accused[,] or do you have a close friend or family member[s], someone close to you, who has been a victim or has been accused of sexual abuse of a child?" After a show of hands, the court stated, "I think under the circumstances because it is such a sensitive question in a person's background, I would invite each one of you to come in with the attorneys present in chambers, and we'll ask you a few questions and then follow through with that." Venire members who had raised their hands

were then called into chambers to be questioned individually. Apparently by inadvertence, no record was made of this part of the voir dire. Similarly, the State's objection to trial counsel's question to Mother regarding Stepfather's drug use led to a bench conference that was not recorded.

¶53 Burnside asserts that because of these missing portions in the record he is prejudiced in two ways. With regard to the jury voir dire, Burnside argues that "his due process rights have been violated because an adequate record was not preserved." Specifically, he contends that, because the district court "did not properly record the proceedings," "an adequate record was not preserved in order for him to know which potential jurors were objected to and whether potential problem jurors ended up on the jury panel." And regarding the bench conference, Burnside claims that the lack of a record prejudiced "his ability to raise that issue on appeal." He notes that, although "[o]ne can conclude that the ruling was against [him] because there were no additional questions asked regarding drug use and [Stepfather]'s criminal activity," the incomplete record "does not reflect what evidence [trial counsel] wished to introduce."

¶54 Burnside is correct that "[d]ue process requires that there be a record adequate to review specific claims of error already raised." *State v. Prawitt*, 2011 UT App 261, ¶ 8, 262 P.3d 1203 (citation and internal quotation marks omitted). "However, the ultimate burden is on a defendant to make certain that the record he compiles will adequately preserve his arguments for review." *Id.* (citation and internal quotation marks omitted); *see id.* ("One who fails to make a necessary objection *or who fails to ensure that it is on the record* is deemed to have waived the issue." (internal quotation marks omitted)). But even a claim of constitutional error requires that a defendant demonstrate non-speculative prejudice in order to be entitled to relief. *See State v. Hards*, 2015 UT App 42, ¶ 19, 345 P.3d 769 ("Proof of ineffective assistance of counsel must be 'a demonstrable reality and not a speculative matter.'" (quoting *State v. Chacon*, 962 P.2d 48, 50

(Utah 1998)). And in the absence of "an adequate record on appeal, we presume the regularity of the proceedings below." *State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278. Indeed, "[w]hen crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court." *Id.* (citation and internal quotation marks omitted). And a similar rule applies to the actions of counsel: "Where the record appears inadequate in any fashion, ambiguities or deficiencies resulting therefrom simply will be construed in favor of a finding that counsel performed effectively." *Litherland*, 2000 UT 76, ¶ 17.

¶55    Burnside acknowledges that the absence of a record poses a hurdle for his claims on appeal. He concedes that because he does not have a record of the in-chambers voir dire he is unable to know whether he had a fair and impartial jury and that the incomplete record "does not reflect what evidence [trial counsel] wished to introduce" about Stepfather's purported drug use.[7] But the burden is on the appellant to provide an adequate record, *see State v. Davis*, 2013 UT App 228, ¶ 92, 311 P.3d 538, and given the presumptions that apply in the absence of a complete record, Burnside simply cannot show that he was harmed by any error of court or counsel in the jury selection or by the court's sustaining the State's evidentiary objection.

¶56    And though on its face this may appear to create a Catch-22 for an appellant, the law does not leave a defendant helpless in a situation like this. For instance, rule 11 of the Utah Rules of Appellate procedure provides for supplementation of an inadequate record. *See* Utah R. App. P. 11(g) (allowing "the

---

7. We have dealt with Burnside's arguments regarding the sustaining of the State's objection to his counsel's question to Mother regarding arguments about Stepfather's purported drug use in more detail above. We address the issue again here because Burnside raises it separately in connection with his claims relating to the failure to preserve a record.

appellant [to] prepare a statement of the . . . proceedings from the best available means, including recollection" if a transcript is unavailable). And rule 23B allows a party to move for remand to the trial court for findings "necessary for the . . . determination of a claim of ineffective assistance of counsel," which could allow, for example, the collection of evidence from those present during the unrecorded proceedings to fill in the missing portions of the record with testimony about what occurred. *See id.* R. 23B(a). But the defendant "bears the primary obligation and burden of moving for a temporary remand." *Litherland*, 2000 UT 76, ¶ 16.

¶57    Here, Burnside did not move for a remand under either rule in order to fill the gaps in the record. And when he did have the opportunity to do just that at the evidentiary hearing following his motion to arrest judgment, the result did not support his position on appeal. During that hearing, Burnside called only one witness, his former trial counsel. Counsel testified that he understood the importance of a fair and impartial jury and that he made his best efforts to select a jury that met those criteria. In fact, counsel testified that during the in-chambers proceeding, he and the prosecutor agreed that certain venire members would be stricken for cause. And when asked if he would have objected to any potential jurors he felt could not fairly hear the case, he responded, "Oh, yeah. Certainly." With regard to the bench conference, he stated that although the State's objection to questioning about Stepfather's drug use had been sustained, he was able to introduce other evidence to support his argument that Child's PTSD could be accounted for by aspects of her life other than sexual abuse.

¶58    In its written decision, the trial court concluded with respect to the in-chambers voir dire, that Burnside "ha[d] failed to demonstrate that he was unfairly prejudiced," and although "the Court [was] unable to identify any specific objections that were made in chambers, the record that was [preserved] clearly demonstrate[d] Mr. Burnside was comfortable with the jury that

was seated because he passed the panel for cause." The court also found that Burnside had "fail[ed] to identify any seated juror [who] expressed a bias or conflict of interest 'so strong or unequivocal as to inevitably taint the trial process.'" (Quoting *State v. Winfield*, 2006 UT 4, ¶ 17 n.3, 128 P.3d 1171.) And with respect to the bench conference on the State's objection, the court found that Burnside "waived the issue by failing to ensure a proper record was preserved."

¶59 We agree with the district court. Burnside did not take advantage of the available means to ensure a record adequate for his appeal. Because Burnside has the ultimate responsibility to make sure that "the record he compiles will adequately preserve his arguments for review," *see State v. Johnson*, 2006 UT App 3, ¶ 13, 129 P.3d 282 (internal quotation marks omitted), and because he failed to take any reasonable steps to meet that burden, we must presume the regularity of the proceedings and the effective performance of counsel.

¶60 Accordingly, because Burnside cannot show that he was actually prejudiced by the failure to make a record of either the in-chambers voir dire or the bench conference on the State's evidentiary objection, his related claims of plain error and ineffective assistance of counsel fail.

CONCLUSION

¶61 Burnside's claims on appeal largely mirror his claims in his motion to arrest judgment. After reviewing each, we hold that the trial court did not err in denying the motion. Specifically, we are not persuaded that trial counsel provided ineffective representation or that the court plainly erred in a way warranting relief for the judgment of conviction. Accordingly, we affirm.

————