2023 UT App 42

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
AVERY HOLIDAY MITCHELL,
Appellant.

Opinion
No. 20200371-CA
Filed April 20, 2023

Third District Court, Salt Lake Department
The Honorable Heather Brereton
No. 191901794

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUSTICE JILL M. POHLMAN and JUDGE RYAN M. HARRIS concurred.[1]

CHRISTIANSEN FORSTER, Judge:

¶1 Avery Holiday Mitchell appeals his convictions of one count of rape of a child and two counts of aggravated sexual abuse of a child. We affirm.

---

1. Justice Jill M. Pohlman began her work on this case as a member of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on this case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

BACKGROUND

¶2     Mitchell's convictions arose from several incidents involving two of his family members—twelve-year-old Leah and thirteen-year-old Penny.[2] At the time of the abuse, Leah and Penny were living in their grandparents' apartment, where Mitchell was also living.

¶3     When the abuse came to light, Leah and Penny spoke to their mother, their stepfather, two aunts, and their grandparents about the abuse before going to the Children's Justice Center for an interview with a police detective (Detective). They also were examined by a nurse (Nurse) to whom they relayed their experiences. There is no information in the record about what specific details the girls shared with their family and with Detective.

¶4     At trial, Nurse testified that Leah told her Mitchell had "used his penis . . . to touch [her] vagina" on six different occasions but that Leah did not specifically mention penetration. Nurse testified that Penny told her Mitchell had "raped [her] in [her] vagina and bottom" but that she did not mention anything about him touching her breasts. Nurse did not observe any injuries in her examination of either girl.

¶5     At trial, Leah testified that while she was sleeping on a beanbag chair, she woke to find Mitchell on top of her and that he put his penis in her vagina. She further testified that the same thing happened on a second occasion when she was resting on her grandparents' bed. She also testified that Mitchell touched her vagina on each of these occasions.

¶6     At trial, Penny testified that Mitchell would sometimes "grab" her breasts when she lived in the apartment and that it

---

2. We use pseudonyms to refer to Mitchell's victims.

happened about twenty-five times. In particular, she recalled him grabbing her breast for "a couple of seconds" when she was "cooking or cleaning" in the kitchen. She also recalled Mitchell touching her breast while she played video games with him in his room. On cross-examination, Mitchell's attorney (Defense Counsel) asked Penny if she recalled telling Nurse that Mitchell had "raped [her] in [her] vagina and in [her] bottom," and she said, "Yes."

¶7    In addition to witness testimony, the jury heard a recording of Detective's interview with Mitchell, in which Mitchell admitted that he "had sex" with Leah on the beanbag chair and that his penis went into her vagina "a little bit." He also admitted to rubbing the outside of her vagina with his hand. He further admitted to "cupping" Penny's breast when they were in the kitchen, although he claimed it was an accident.

¶8    Detective testified about his training in conducting interviews with children who may be victims of crime, as well as his training in conducting interviews with adult suspects. He explained that he was taught to ask children "open ended questions, to be non-leading and allow the child to tell a narrative of an incident in their words with some room for clarification." He was taught not to "introduce any information to" children because they "can be easily led or suggested in an interview." Detective testified that he used these techniques when questioning Leah and Penny. Detective then explained that when questioning an adult suspect, he uses the "Reid Interview and Interrogation" model, which recommends asking the suspect for a narrative, while also using "suggestive questioning" by "giv[ing] [the suspect] a little bit of information on what [the officer] know[s] and then allow[ing] [the suspect] to elaborate on it."

¶9    While cross-examining Detective, Defense Counsel elicited more detail about Detective's interview techniques, including the

ways a child's testimony may be contaminated if appropriate techniques are not followed. He also asked Detective about leading questions he used in his interview with Mitchell to try to obtain a confession. Finally, Defense Counsel asked Detective about some of the differences between what Leah and Penny told him in their interviews and what they testified to at trial. Defense Counsel suggested in his opening statement and argued in his closing that Leah's and Penny's recollections were contaminated by their previous discussions with multiple family members and that Detective had coerced Mitchell into a false confession.

¶10 During closing argument, the State discussed the evidence supporting each of the three charges. With respect to Count 1, rape of a child, the State made clear that this count had to do with Leah and reminded the jury of the evidence—including Mitchell's own admission—that Mitchell had sexual intercourse with Leah on the beanbag chair. Other than a brief reference in rebuttal, the State did not discuss the incident on the bed that Leah had also recounted. With respect to Count 2, the first count of aggravated sexual abuse of a child, the State also made clear that this count had to do with Leah and reminded the jury of the evidence—including Mitchell's own admission—that Mitchell touched Leah's vagina with his hand. Finally, with respect to Count 3, the second count of aggravated sexual abuse of a child, the State made clear that this count had to do with Penny and reminded the jury of the evidence that Mitchell touched Penny's breast in the kitchen and pointed out how that evidence lined up with Mitchell's confession. The State also explained that the jury should not consider any evidence of sexual contact between Mitchell and Penny besides him touching her breast in reaching its verdict on Count 3.

¶11 The jury returned a guilty verdict on all three counts. Mitchell appeals.

ISSUES AND STANDARDS OF REVIEW

¶12     Mitchell raises three claims of error on appeal: (1) that Detective's testimony regarding interrogation techniques was expert testimony that he should not have been allowed to give without first being disclosed and qualified as an expert, (2) that the jury instructions did not adequately define the elements of rape of a child, and (3) that the jury instructions should have included a specific unanimity instruction.

¶13     Mitchell did not raise any of these issues before the district court and therefore asks us to consider each of these arguments through the lens of ineffective assistance of counsel and plain error. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified). The plain error standard of review requires an appellant to show that "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (quotation simplified); *see also State v. Ringstad*, 2018 UT App 66, ¶ 32, 424 P.3d 1052, *cert. denied*, 425 P.3d 802 (Utah 2018).

ANALYSIS

I. Detective's Testimony

¶14     Mitchell first asserts that Detective's testimony regarding interview techniques was impermissible expert testimony because it was not timely disclosed and that either Defense Counsel was ineffective for failing to object to the testimony or the district court plainly erred by allowing it. However, we are not

persuaded either that Defense Counsel performed deficiently or that the district court was confronted with an obvious error that it should have corrected.

¶15   To prevail on grounds of ineffective assistance, a defendant must demonstrate, first, "that counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment," and second, "that counsel's deficient performance was prejudicial—i.e., that it affected the outcome of the case." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). When trial counsel's actions "might be considered sound trial strategy, it follows that counsel did not perform deficiently." *State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350 (quotation simplified).

¶16   Here, Defense Counsel relied heavily on Detective's description of his interview techniques to support Mitchell's defense. That defense focused on undermining Leah's and Penny's credibility and attempting to convince the jury that Detective had manipulated Mitchell into a false confession. The primary way Defense Counsel attempted to undermine Leah's and Penny's testimony was by asserting that their versions of events were inaccurate, that is, that their recollections of what happened to them were contaminated by their discussions with multiple family members before they were interviewed by Detective. With respect to Mitchell's police interview, the defense strategy focused on trying to convince the jury that Detective had manipulated him into admitting to things that did not really happen by asking him suggestive and leading questions. To set up these arguments, Defense Counsel cross-examined Detective extensively concerning his interview techniques, including soliciting information about the types of questions that might contaminate a child's testimony and specific leading questions he used in questioning Mitchell. Given Mitchell's incriminating admissions, Defense Counsel had few attractive strategic defense options. Attempting to undermine the State's key witnesses was

perhaps the best option Defense Counsel had available. Without Detective's description of his interview techniques and how his interviews of the victims and Mitchell differed, that defense would have been more difficult to support. Under these circumstances, it was an objectively reasonable strategy for Defense Counsel to forgo an objection to the admissibility of Detective's testimony and to instead try to use that testimony to Mitchell's advantage.

¶17 Furthermore, Mitchell cannot establish plain error because it would have been apparent to the district court that Defense Counsel was relying on Detective's testimony to further his trial strategy. "Our adversary system . . . relies generally on objections from parties to police the admissibility of evidence. We do not require or even expect our trial judges to exercise their own independent judgment on the question of admissibility." *State v. Hummel*, 2017 UT 19, ¶ 109, 393 P.3d 314; *see id.* ¶ 108 (explaining that prosecutorial misconduct will rise to the level of plain error only where it is "both highly prejudicial and clearly inadmissible"). Thus, counsel has the prerogative to forgo any objection to even inadmissible testimony for the purpose of advancing a reasonable trial strategy, and the district court does not commit plain error by not sua sponte raising its own objection under such circumstances. *See State v. Burnside*, 2016 UT App 224, ¶ 42, 387 P.3d 570 ("[A]n attorney's decision to forgo an objection as a matter of trial strategy cuts strongly against a finding of . . . plain error . . . ."); *State v. Morgan*, 813 P.2d 1207, 1211 (Utah Ct. App. 1991) (rejecting a plain error claim based on a failure to object because "it was within counsel's professional discretion to not object to testimony that would aid [counsel's] strategy"); *cf. Hummel*, 2017 UT 19, ¶ 110 ("[T]he law recognizes the prerogative of opposing counsel to swallow their tongue instead of making an objection that might have the risk of highlighting problematic evidence or even just annoying the jury.").

¶18 In his opening statement, Defense Counsel informed the jury that Detective would testify "that there is a protocol for interviewing young kids about sexual abuse" and explain that protocol. Defense Counsel outlined Mitchell's defense that the victims' testimonies had been contaminated and that Detective manipulated Mitchell into a false confession. This opening statement would have indicated to the district court not only that Defense Counsel had no objection to Detective's anticipated testimony, but also that he planned to use it to Mitchell's advantage. Thus, the district court would have had no reason to believe that the testimony was objectionable to the defense, and it did not plainly err by not intervening.

¶19 Because it was objectively reasonable for Defense Counsel to use Detective's testimony to further his sound trial strategy, Mitchell cannot establish that Defense Counsel performed deficiently by declining to object to the testimony or that the district court committed plain error by not sua sponte excluding the testimony.

## II. Elements Instruction

¶20 Mitchell next asserts that there is a "constitutional concern[] created by . . . ambiguous terms in the child-rape statute[]."[3] The jury was instructed that it could find Mitchell

---

3. Mitchell asserts that this issue was preserved because the district court expressed concern about the "touching" language originally proposed in the State's instruction. However, the district court's concern was ultimately resolved to its satisfaction after it determined that the instructions the State had proposed were consistent with the Model Utah Jury Instructions. Defense Counsel did not object to the district court's conclusion and ultimately approved the instructions. Thus, the issue raised on appeal—that the jury instructions did not, in fact, resolve the constitutional concern—was not preserved.

guilty of rape of a child if (1) he "[i]ntentionally, knowingly, or recklessly . . . [h]ad sexual intercourse with [Leah]" and (2) Leah "was under 14 years old at the time of the conduct." The instructions further clarified, "For purposes of Rape of a Child, sexual intercourse can be accomplished by any touching, however slight." And the instructions went on to define "touching" as "to bring a bodily part briefly into contact with so as to feel; to examine by touching or feeling with the fingers; to cause to be briefly and lightly in contact or conjunction with something; to meet without overlapping or penetrating; to be or become contiguous or adjacent to; or to impinge upon, adjoin; to feel something with a body part."[4] Mitchell asserts that these instructions suggest that a person can be convicted of rape of a child by simply touching a child's vagina with the fingers, without any penetration, which would make the crime of rape of a child indistinguishable from the crime of sexual abuse of a child. *Compare* Utah Code § 76-5-402.1(2)(b) ("Any touching, however slight, is sufficient to constitute the relevant element of [rape of a child]."), *with id.* § 76-5-404.1(2)(a) ("[A]n actor commits sexual abuse of a child if [with the requisite intent] the actor: (i)(A) touches the anus, buttocks, pubic area, or genitalia of any child . . . .").

¶21 In the abstract, these instructions could be potentially confusing to a jury, even though they are consistent with the current language of the rape of a child statute, *see id.* § 76-5-402.1(2). *See generally State v. Hutchings*, 2012 UT 50, ¶ 23, 285 P.3d 1183 (explaining that even jury instructions that are legally correct can be inappropriate if they have "potential for confusion and could have misled the jury"). That is, if "sexual intercourse" can be accomplished by "[a]ny touching, however slight," *see* Utah

---

4. "Touching" is not defined in the statute, and it is not clear from our review of the record how the court arrived at the definition provided in the jury instructions.

Code § 76-5-402.1(2), and the jury instructions defined "touching" as "to meet *without* . . . penetrating" and to include "touching . . . with the fingers," we see the potential for definitional confusion.[5] (Emphasis added.)

¶22 However, Mitchell's argument ends up being academic here because he admitted to penetrating Leah's vagina with his penis. Thus, his complaint that both child rape and child sexual abuse can potentially be established by merely touching a child is not of consequence in this case, because rape of a child requires "sexual intercourse" as an element and Mitchell admitted to the sexual penetration that satisfies the ordinary definition of sexual intercourse. *See* Utah Code § 76-5-402.1(2)(a) ("An actor commits rape of a child if the actor has sexual intercourse with an individual who is younger than 14 years old."); *In re C.N.*, 2023 UT App 41, ¶ 37. As this court explained in *State v. Jones*, 2018 UT App 110, 427 P.3d 538, *cert. denied*, 432 P.3d 1226 (Utah 2018), where a defendant's "alleged acts include not only impermissibly touching [a victim], but also penetrating her," the "alleged conduct—penetration—is clearly prohibited." *Id.* ¶ 17; *see also id.* ¶¶ 15–17 (finding that actual penetration meets the definition of

---

5. To the extent that current statutory language does not reflect legislative intent, the legislature might consider providing a statutory definition of the term "sexual intercourse" that explains whether penetration of a child's sexual organ is required and which body parts must be involved so as to distinguish this crime from other sexual offenses against children. Moreover, district courts should take steps to ensure that jury instructions incorporate relevant clarifications provided by our courts, *see, e.g.*, *In re C.N.*, 2023 UT App 41, ¶ 37 (interpreting "sexual intercourse," as used in section 76-5-402.1 of the Utah Code, to mean specifically vaginal intercourse), particularly where the facts of the case present any ambiguity regarding the acts constituting the crime in question.

sexual intercourse and overruling an unconstitutional vagueness challenge to the child rape statute).

¶23　Even if the jury instructions had the potential to lead the jury to believe that some touching other than penetrative touching between Mitchell's penis and Leah's vagina could support a conviction for rape of a child, the evidence pertaining to Count 1—which included Mitchell's own confession that he inserted his penis into Leah's vagina at least "a little bit"—clearly concerned the alleged rape of Leah on the beanbag. And Mitchell does not suggest how the instructions should have been altered or how an altered instruction could have made a difference to the outcome of his case. Under these circumstances, we are not persuaded that there was a reasonable likelihood that the jury based its rape-of-a-child conviction on any touching other than the penis-to-vagina penetration that occurred on the beanbag. Because Mitchell did not suffer prejudice as a result of any ambiguity in the elements instruction, he cannot establish either plain error or ineffective assistance of counsel. *See State v. McNeil*, 2016 UT 3, ¶ 29, 365 P.3d 699.

### III. Unanimity Instruction

¶24　Finally, Mitchell argues that the jury instructions should have more specifically identified the charged incidents to ensure a unanimous verdict. Once again, he raises this unpreserved argument on grounds of plain error and ineffective assistance of counsel. And once again, we find no prejudice resulting from the alleged error.

¶25　In Utah, a criminal defendant can be convicted only if the verdict is unanimous. Utah Const. art. I, § 10. "This requirement is not met if a jury unanimously finds only that a defendant is guilty of a crime; rather, jury unanimity means unanimity as to a specific crime and as to each element of the crime." *State v. Whytock*, 2020 UT App 107, ¶ 30, 469 P.3d 1150 (quotation

simplified), *cert. denied*, 481 P.3d 1043 (Utah 2021). Mitchell asserts that more detailed jury instructions were necessary in this case because multiple allegations of abuse were raised that could have supported the charges. For example, since Leah testified that Mitchell raped her both on the beanbag chair and on the bed, some jurors may have based his Count 1 conviction on one incident while other jurors based it on the other incident. Likewise, since Penny testified that Mitchell touched her breasts both in the kitchen, while she was cooking or cleaning, and in the bedroom, while she was playing video games, different jurors may have based Mitchell's Count 3 conviction on different incidents.

¶26     Even if we presume, for purposes of the argument, that Defense Counsel performed deficiently by failing to request a specific jury unanimity instruction, Mitchell has failed to demonstrate that he sustained prejudice as a result, given his clear admission that he committed acts that amount to each of the crimes of which he was convicted. While several incidents of abuse came up during the trial, Mitchell confessed to three specific incidents—the rape on the beanbag chair, touching Leah's vagina, and touching Penny's breasts in the kitchen. Moreover, the State linked the charges to those three incidents in its closing argument. Discussing Count 1, the State's main closing argument did not mention the bed incident at all.[6] Instead, the prosecutor discussed both Leah's and Mitchell's accounts of the beanbag incident. Discussing Count 2, the prosecutor referred only to

---

6. The prosecutor did briefly mention the bed incident during the State's rebuttal closing: "[Leah] said she was raped twice on the beanbag and on a bed." But we do not think it likely that this isolated statement would have led the jury to rely on the bed incident given the State's otherwise exclusive discussion of the beanbag incident in outlining Count 1 and Mitchell's confession to that incident.

Mitchell's action of touching Leah's vagina with his fingers. He also explicitly informed the jury that this charge concerned only Mitchell's conduct with Leah, not any of his conduct with Penny. Finally, discussing Count 3, the prosecutor primarily focused on the evidence that Mitchell touched Penny's breast in the kitchen. While he also referred to Penny's testimony that Mitchell touched her breast while they were playing video games in his bedroom, the prosecutor emphasized Mitchell's admission concerning the kitchen incident, even replaying the portion of his interview that referred to the incident. The State also drew attention to the consistency between Penny's and Mitchell's accounts of what happened in the kitchen.

¶27    Given the State's clear emphasis on the three incidents to which Mitchell confessed and the strong evidence of the crimes provided by his confession, we are not convinced that there is a reasonable likelihood that any of the jurors based their guilty verdict on other incidents briefly addressed during trial. *See State v. Mottaghian*, 2022 UT App 8, ¶ 66, 504 P.3d 773, *cert. denied*, No. 20220349, 2022 WL 19300388 (Utah 2022); *State v. Case*, 2020 UT App 81, ¶ 26, 467 P.3d 893 (holding there was no reasonable probability that the jury would have reached a different result had it been specifically instructed that all jurors needed to agree on the specific act underlying each count), *cert. denied*, 474 P.3d 948 (Utah 2020). Mitchell therefore cannot establish that he was prejudiced by any error in the jury instructions regarding unanimity and, accordingly, cannot establish either plain error or ineffective assistance of counsel.

CONCLUSION

¶28    Because Defense Counsel planned his sound legal defense strategy on Detective's anticipated testimony about interview techniques, we are not persuaded that he performed deficiently by not objecting to that testimony, and we are not persuaded that

the district court plainly erred by not stepping in sua sponte to exclude it. Moreover, Mitchell was not prejudiced by the other two alleged errors he challenges on appeal and therefore cannot obtain reversal on grounds of plain error or ineffective assistance of counsel with respect to those claims. Accordingly, we affirm his convictions.

––––––––––