**2023 UT App 41**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF C.N.,
A PERSON OVER EIGHTEEN YEARS OF AGE.

C.N.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20200460-CA
Filed April 20, 2023

Fourth District Juvenile Court, Spanish Fork Department
The Honorable F. Richards Smith
No. 1148011

Margaret P. Lindsay, Douglas J. Thompson, and Alex
Stephen Clark, Attorneys for Appellant

Sean D. Reyes and Lindsey L. Wheeler, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGE DAVID N. MORTENSEN and JUSTICE JILL M.
POHLMAN concurred.[1]

CHRISTIANSEN FORSTER, Judge:

¶1     C.N. appeals the juvenile court's adjudication of rape of a
child on the ground that there was not sufficient evidence

---

1. Justice Jill M. Pohlman began her work on this case as a member
of the Utah Court of Appeals. She became a member of the Utah
Supreme Court thereafter and completed her work on the case
sitting by special assignment as authorized by law. *See generally*
Utah R. Jud. Admin. 3-108(4).

presented at trial to establish sexual intercourse as defined in the Utah Code. We agree and reverse.

## BACKGROUND[2]

¶2     C.N. lived out-of-state but regularly traveled to Utah to spend time with her sister (Sister) and Sister's two children. In December 2016, on one of these visits, C.N. met Seth[3] and Sally, the children of Sister's close friend (Friend). At the time, Seth was nine years old and C.N. was seventeen years old.

¶3     Friend "need[ed] a babysitter," so she sent Seth and Sally to Sister's house. Once at Sister's house, Sally, Seth, C.N.'s niece Abby, and C.N. played together outside at a park where they "were joking around saying how [they] wanted to be nasty." The group then returned to Sister's house, where C.N. "threw some sheets over the bunk bed so nobody could see if they were to walk in." The sheet covered "the big part" of the bed "where you would go to lay down" but left the two short sides of the bed exposed.

¶4     C.N. and Seth were on the bottom bunk, partially hidden by the hanging sheet. Sally and Abby remained in the room where they were able to see "[a] little bit" of what was going on behind the sheet. Sally observed Seth "on top" of C.N. "in a way that caused [her] some concern."

¶5     A few months after the visit, Sally disclosed to her mother that something happened between C.N. and Seth. She explained that she was "forced to watch" as C.N. "raped" Seth on the bunk bed. After this disclosure, Friend "immediately called [Sister], and

---

2. "On appeal from a bench trial, we view the evidence in the light most favorable to the juvenile court's findings." *In re J.A.M.*, 2020 UT App 103, n.1, 470 P.3d 454 (quotation simplified).

3. We use pseudonyms to protect the privacy of the victims and witnesses in this case.

. . . told her what [Sally] had" said. Sister was "in denial" but agreed to ask Abby what had happened. Shortly after, Sister called back "in tears" and informed Friend that Abby had confirmed Sally's story. Friend then talked to Seth, who told her "bits and pieces" of what happened, although he was mostly "shut down." The next day, Friend called the police and reported the sexual assault.

¶6    A caseworker with the Division of Child and Family Services interviewed Seth at the Children's Justice Center (CJC). During the interview, Seth explained that one day he was playing "house" at a school playground with Sally, C.N., and Abby when Sally "brought up . . . getting the F word," but Seth did not "know what that mean[t]." After leaving the playground, the group walked to Sister's house; during the walk, C.N. "brought it up again."

¶7    Once at Sister's house, the group went into the bedroom and started playing house again. C.N. told Seth "that she actually wanted to do it with [him], but [he] said no." Seth then asked Sally to walk him to the bathroom "because [he] had to talk to her." He told Sally to "start crying" if C.N. "brought [up] anything about it" again so they "didn't have to pay attention to" it. After the two returned to the bedroom, however, Sally and Abby "got addicted to their tablets, . . . playing on Facebook and stuff," and stopped playing house.

¶8    C.N. then "brought up . . . this s-e-x thing" and told Seth "to do it with her or else she would hurt [him]." Seth told C.N. he did not know "what [s-e-x] spells" or "what [it] means," after which she told him "it means [him] sticking [his] middle part up her butt." Seth also did not know the name for his "middle part" but explained it is used "[f]or peeing."

¶9    Following this exchange, C.N. directed Sally and Abby to use blankets to build a "tent" over the bottom bunk of the bunk bed. C.N. again threatened Seth that "if [he] didn't do it she would hurt [him]" and that "if [he] told anybody she would hurt

[him]." Seth "said fine, as long as you don't hurt me," and then "[t]he s-e-x thing happened."

¶10    Seth recounted that at C.N.'s direction, he first pulled his pants and underwear down to his knees. C.N. then pulled her pants and underwear down to her feet and "told [Seth] to put [his] middle part in her butt." She told Seth he "would have to do this s-e-x thingy for five minutes."

¶11    C.N. was positioned with "her hands and her knees on the bed" and Seth was "on [his] knees" "behind her." Seth could see C.N.'s "butt hole" and "her butt." His "middle part" was "sticking up and pointing" at C.N.'s back. C.N. was looking forward and could see Sally, Abby, and the bedroom door through a gap between the sheet and the bunk bed. Seth opined that C.N. was watching the room because she did not "want[] anybody to know" what was happening behind the blankets. Nevertheless, Seth said that Sally was able to view what was going on and Abby might have seen.

¶12    When Seth put his "thingy in [C.N.'s] butt," he "felt her butt hole," which was "soft." Seth explained they "looked like an animal connected together" with "a stick in the middle"; the "stick" was his "middle part." Seth further explained that his body "didn't feel comfortable," "it didn't feel right," and he "felt like [he] was going to get hurt." Seth also said that while his "thingy was still in [C.N.'s] butt," she "moaned once," "for like one minute and like five seconds." After five minutes had elapsed, Seth "ran outside." C.N. followed him and reminded him that if he told anybody what had happened, she would physically hurt him "in a serious way."

¶13    Following Seth's CJC interview, a police officer (Officer) from the local police department attempted to contact C.N. for an interview. However, C.N. had already returned home, and Officer was unable to interview her in person. But Officer did eventually receive a copy of an interview with C.N. at the CJC in her home state. After reviewing the video, Officer concluded that

"C.N. corroborated most of the facts that were . . . laid out by" Seth, including "the location, being on the bed, [and] putting the sheets up to kind of hide things," but that "[s]he denied any sexual activity happened." Officer also observed that during the interview C.N. "contradicted herself several times." Notably, C.N. said Seth "initially got on top of her, then she changed her story and said that he kept trying to get on top of her" but "she pushed him away with her foot"; "[t]hen she said she was frozen and couldn't act."

¶14 As part of his investigation, Officer also "briefly" interviewed two other children that were at Sister's house when the incident happened. Officer identified one child as Sally, but he could not remember the other child's name. Both children had been "preoccupied by their electronics" at the time of the incident and "couldn't provide anything that was . . . of any use to the case."

¶15 The State filed a petition alleging C.N. had committed rape of a child under fourteen. Before trial, a competency evaluation was performed on C.N., and the juvenile court found her incompetent to proceed. After working a competency attainment plan, C.N. was reevaluated and found competent to stand trial.

¶16 In April 2020, the matter was tried to the bench. At trial, Seth's CJC interview, which the State classified as "the bulk of [its] case," was played for the court. On cross-examination, Seth, who was then twelve years old, was unable to remember all the details from the incident. However, he did testify that during the "sex thingy," he took his pants "down to [his] knees" and C.N. "was like on all fours on the bed with her head on the pillow." C.N. then told Seth to "put [his middle thingy] in her butt," which he did. Seth also testified that the "sex thingy" happened on the bottom bunk of the bunk bed and he thought there were "coverings around the bed." He then clarified that he "believe[d]" Sally saw what had happened because Sally and Abby were in the room, close to the bed, and he observed Sally turn her head and look at the bed. However, he also confirmed that at

the time of the incident, both Sally and Abby were playing on Abby's tablet.

¶17 Officer testified next for the State. In addition to testifying about the information listed above, Officer testified about his impressions after watching a recording of Seth's CJC interview. Over C.N.'s objection, Officer opined that, based on his experience as a sex offender investigator and a sex crimes investigator, during which time he had "done numerous interviews with children," it is common for children to "refer to their genitalia as their bottom." Consequently, it is the job of the interviewer to "ask follow up questions to . . . clarify what a child's talking about," i.e., whether "bottom" means penis, vagina, or anus. Based on his experience, Seth's description "that it felt like it was soft when he put his penis in there," and the follow-up questions[4] asked during the CJC interview, Officer was able to "narrow" down Seth's statements to determine that, in his opinion, Seth "had inserted his penis into [C.N.'s] vagina."

¶18 Abby testified for the defense. Abby's testimony was largely consistent with Seth's and Sally's. Abby explained that at the time of the incident, the bottom bunk was covered with blankets. C.N. and Seth were on the bed, and Abby and Sally were sitting on the floor. Abby then climbed to the top bunk while Sally remained on the floor playing with Abby's tablet. From the top bunk, Abby was able to see into the bottom bunk. She observed C.N. on the bed "laying on her stomach on her phone." Seth was also on the bed, "laying there on top of [C.N.]" with his arms "wrapped . . . around her stomach."

¶19 At the close of the evidence, the juvenile court adjudicated C.N. for rape of a child. The court explained that the "only question" was "whether there was sexual intercourse." After reviewing Seth's testimony, particularly his CJC interview, the court found that Seth's testimony had "multiple indicia of

---

4. Officer did not specify any particular follow-up questions or answers that helped him draw his conclusions.

veracity," including that he had been "consistent." Accordingly, the court concluded he was "a credible witness" and, "based upon that," found the allegation was true.

¶20 Following a disposition hearing, C.N. was placed on probation. On August 27, 2020, the juvenile court terminated C.N.'s probation and its jurisdiction.

## ISSUE AND STANDARD OF REVIEW

¶21 C.N. now appeals, raising one issue for our review. C.N. argues there was insufficient evidence presented at trial to support the juvenile court's adjudication for rape of a child.[5] We review challenges to the sufficiency of the evidence for clear error, reversing "only when it is apparent that there is not sufficient competent evidence as to each element of the crime charged." *State v. Bagnes*, 2014 UT 4, ¶ 10, 322 P.3d 719 (quotation simplified). "However, before we can uphold [an adjudication,] it must be supported by a quantum of evidence concerning each element of the crime as charged from which the factfinder may base its conclusion of guilt beyond a reasonable doubt." *In re W.E.M.*, 2016 UT App 250, ¶ 8, 391 P.3d 352 (quotation simplified). And where examining a sufficiency of the evidence argument "also present[s] a threshold question of law—of the elements of the underlying offense"—our review of that threshold question is "non-deferential." *Bagnes*, 2014 UT 4, ¶ 10.

---

5. "[A]n adjudicative hearing is analogous to a criminal trial in adult court . . . ." *In re A.H.F.*, 2011 UT App 437, ¶ 6 n.2, 269 P.3d 165; *see also* Utah R. Juv. P. 5(b) ("'Adjudication' means a finding by the court, incorporated in a judgment or decree, that the facts alleged in the petition have been proved."). Put differently, "[t]he adjudication hearing is typically when guilt or innocence to a criminal charge is determined." *In re J.W.*, 2004 UT App 482, ¶ 5, 105 P.3d 962 (per curiam).

ANALYSIS

¶22 C.N. argues the juvenile court erred in adjudicating her for rape of a child because the evidence presented at trial was insufficient to prove beyond a reasonable doubt that she committed each element of the offense. Specifically, she contends that the touching described in Seth's testimony, "includ[ing] all reasonable inferences that could be drawn therefrom," did not establish the element of "sexual intercourse" as defined under the Utah Code.

¶23 Because C.N.'s sufficiency argument hinges on the juvenile court's determination that the evidence presented was sufficient to establish the element of "sexual intercourse" required for an adjudication of rape of a child, "the threshold question for us concerns the definition of this term." *See State v. Bagnes*, 2014 UT 4, ¶ 12, 322 P.3d 719. "We then consider the sufficiency of the evidence to sustain [an adjudication] under this definition." *See id.*

A. "Sexual intercourse" as used in Utah Code section 76-5-402.1 is limited to vaginal sex.

¶24 C.N. was charged with rape of a child under Utah Code section 76-5-402.1. That section provides, "An actor commits rape of a child if the actor has sexual intercourse with an individual who is younger than 14 years old." Utah Code § 76-5-402.1(2)(a).[6] "Any touching, however slight, is sufficient to constitute the relevant element of [the offense]." *Id.* § 76-5-402.1(2)(b). Thus, to adjudicate C.N. of this offense, the State had to prove that C.N. had "sexual intercourse" with a child "younger than 14 years

---

6. The rape of a child statute has been amended since the events giving rise to this case. The amendments did not, however, change the elements of the underlying offense. We therefore cite the most current version of the Utah Code for the convenience of the reader.

old."[7] *See id.* § 76-5-402.1(2)(a). The statute does not, however, define "sexual intercourse."

¶25    C.N. contends the statutory definition of "sexual intercourse" in Utah's rape of a child statute should be construed narrowly and that it "does not encompass anal or oral sex but is limited to vaginal sex." Conversely, the State maintains the term must be construed broadly and argues that "'sexual intercourse' includes both vaginal and anal intercourse."

¶26    When interpreting a statute, "our primary goal is to ascertain the true intent and purpose of the legislature." *O'Hearon v. Hansen*, 2017 UT App 214, ¶ 23, 409 P.3d 85 (quotation simplified). Because the "best evidence of the legislature's intent is the plain language of the statute itself," *Reynolds v. Bickel*, 2013 UT 32, ¶ 10, 307 P.3d 570 (quotation simplified), we begin our interpretive task by "looking first to the statute's plain language," *see State v. Hatfield*, 2020 UT 1, ¶ 16, 462 P.3d 330 (quotation simplified). Where a statutory term is not defined, we assess the "ordinary meaning" of the term "using the dictionary as our starting point." *See id.* ¶ 17 (quotation simplified).

¶27    Both C.N. and the State point us to multiple contemporary dictionary definitions of "sexual intercourse," which they contend support their respective positions. But those dictionaries simultaneously support both parties. For example, Merriam-Webster defines "sexual intercourse" as "heterosexual intercourse involving penetration of the vagina by the penis" *or* "intercourse (such as anal or oral intercourse) that does not involve penetration of the vagina by the penis." *Sexual intercourse*, Merriam-Webster, https://www.merriam-webster.com/dictionary/sexual%20interco urse [https://perma.cc/2HEU-N7LP]. Similarly, The American Heritage Dictionary defines "sexual intercourse" as a "[s]exual union between a male and a female involving insertion of the

7. C.N. acknowledges the age element is not at issue and therefore challenges only the court's conclusion that the State had established the first element, sexual intercourse.

penis into the vagina" *or* "[s]exual activity that includes insertion of the penis into the anus or mouth." *Sexual intercourse*, The American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=sexual+intercours e [https://perma.cc/5BZB-SWRL].

¶28 Because the competing dictionary definitions may support both parties' proposed interpretations, the dictionary definitions alone are "inadequate." *See State v. Bagnes*, 2014 UT 4, ¶ 14, 322 P.3d 719. However, "we do not interpret the 'plain meaning' of a statutory term in isolation." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 12, 248 P.3d 465. Rather, we assess the "plain language of the statute as a whole and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *Bryner v. Cardon Outreach, LLC*, 2018 UT 52, ¶ 10, 428 P.3d 1096 (quotation simplified). Importantly, "we seek to render all parts [of the statute] relevant and meaningful, and we accordingly avoid interpretations that will render portions of a statute superfluous or inoperative." *Hall v. Utah State Dep't of Corr.*, 2001 UT 34, ¶ 15, 24 P.3d 958 (quotation simplified). "Consequently, when two statutory provisions conflict in their operation, the provision more specific in application governs over the more general provision." *Id.* Applying these rules of statutory construction to the rape of a child statute, we agree with C.N. that the term "sexual intercourse" as used in section 76-5-402.1 is limited to vaginal sex.

¶29 An examination of the current legislative scheme criminalizing sexual offenses against children reveals that other sections of the Utah Code specifically prohibit sexual acts that encompass oral sex and anal sex. For example, Utah's sodomy on a child statute provides that "[a]n actor commits sodomy on a child if . . . the actor engages in *any sexual act* upon or with another individual" who is "younger than 14 years old" when "the sexual act involves the *genitals or anus* of the actor or the individual and the *mouth or anus* of either the actor or individual." Utah Code § 76-5-403.1(2)(a) (emphases added). Thus, the sodomy on a child statute specifically criminalizes conduct amounting to oral sex or

anal sex, i.e., sexual contact between the mouth and genitals or the anus, or sexual contact between the anus and genitals. Accordingly, if we were to interpret "sexual intercourse" in the rape of a child statute to encompass acts of oral sex and anal sex—conduct already specifically criminalized under the sodomy on a child statute—parts of the sodomy on a child statute would be rendered superfluous.[8] That is, reading the definition of "sexual intercourse" expansively to include oral sex and anal sex would result in the sodomy on a child statute becoming largely duplicative of the child rape statute.

¶30 Relatedly, because both the sodomy on a child statute and the rape of a child statute purport to cover the same subject, our rules of statutory construction provide that "the provision more specific in application governs over the more general provision." *See Hall*, 2001 UT 34, ¶ 15. In this case, application of this rule dictates that acts of oral sex or anal sex are not encompassed within the definition of "sexual intercourse" in the rape of a child statute. The sodomy on a child statute is more specific than the rape of a child statute because the sodomy statute applies to only conduct "explicitly enumerated in the statute," *see Taghipour v. Jerez*, 2002 UT 74, ¶ 14, 52 P.3d 1252, i.e., sexual contact between the mouth and genitals or the anus, or sexual contact between the

---

8. The sodomy on a child statute prohibits some touching not covered in the rape of a child statute. *Compare* Utah Code § 76-5-403.1(2)(b) (providing that "[a]ny touching, *even if accomplished through clothing*, is sufficient to constitute the relevant element" of the offense of sodomy on a child (emphasis added)), *with id.* § 76-5-402.1(2)(b) (providing that "[a]ny touching, however slight, is sufficient to constitute the relevant element" of the offense of rape of a child). Therefore, even if the rape of a child statute were construed broadly to encompass oral sex and anal sex, the sodomy of a child statute would still have a limited independent purpose in that it criminalizes over-the-clothes touching that the rape statute does not.

anus and genitals. Conversely, the rape of a child statute contains only a general prohibition against "sexual intercourse."

¶31 Lastly, the historical evolution of Utah's laws governing sexual offenses supports our conclusion that "sexual intercourse" does not include oral sex or anal sex. *See generally Mabon v. Wilson*, 133 P.3d 899, 901 (Or. 2006) (using "the history of the evolution of the statutory wording over time" as a tool to determine the plain meaning of a statute).

¶32 Prior to 1983, the Utah Code did not contain any child-specific sexual offenses. Instead, the elements of sexual offenses, and as relevant here, rape and sodomy, applied equally to all victims and the age of the victim was implicated only in the level of the offense. *See, e.g.*, Utah Code §§ 76-5-402, -403 (1982). In 1983, the Utah legislature significantly amended the criminal code and enacted child-specific sexual offenses for rape of a child and sodomy on a child. *Id.* §§ 76-5-402.1, -403.1 (1983). However, the amendments did not alter the conduct elements for either offense: both the 1982 rape statute and the 1983 rape of a child statute required the actor to engage in "sexual intercourse" with the victim. *Compare id.* § 76-5-402 (1982), *with id.* § 76-5-402.1 (1983). Likewise, both the 1982 sodomy statute and the 1983 sodomy on a child statute required the actor to engage in "any sexual act" involving the "genitals" of one person and the "mouth or anus" of the other person. *Compare id.* § 76-5-403 (1982), *with id.* § 76-5-403.1 (1983). Because the conduct elements of "sexual intercourse" and "sexual act" in the child-specific statutes were adopted wholly from those contained in the original adult statutes, the meaning of those terms as understood in the original adult statutes is informative. *See In re Childers-Gray*, 2021 UT 13, ¶ 50, 487 P.3d 96 ("When a word or phrase is transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." (quotation simplified)).

¶33 The crime of rape has always existed in Utah law. In the Compiled Law of Utah 1876, rape was defined as "an act of sexual intercourse accomplished with a female, not the wife of the

perpetrator, under" circumstances demonstrating a lack of consent. Compiled Laws of Utah, tit. IX, ch. I, § 134 (1876). In other words, the crime of rape was possible only between a female and a male.

¶34 In 1943, the criminal code was amended to set the penalty for the crime of rape against young victims. The amendment maintained the gender-specific language of the earlier law—thereby requiring that the crime be committed by a male upon a female—and added additional penalties "[w]hen the female upon whom the act is committed is under the age of thirteen years." Act of March 17, 1943, ch. 25, § 1, 1943 Utah Laws 26, 26. The gendered limitation continued in 1973, when the crime of rape was defined as follows: "A male person commits rape when he has sexual intercourse with a female, not his wife, without her consent." Act of July 1, 1973, ch. 196, 1973 Utah Laws 584, 610.

¶35 Conversely, the crime of sodomy did not exist in Utah law prior to 1923. In 1923, the legislature enacted a new section of the Utah Code setting criminal penalties for sodomy: "Every person who is guilty of sodomy or any other detestable and abominable crime against nature, committed with [humans] or with any animal, with either the sexual organs or the mouth is punishable by imprisonment . . . ." Act of May 8, 1923, ch. 13, § 1, 1923 Utah Laws 21, 21. That definition remained unchanged until 1973, when the legislature redefined the crime as when a person "engages in any sexual act involving the genitals of one person and the mouth or anus of another person, regardless of the sex of either participant." Act of July 1, 1973, ch. 196, 1973 Utah Laws 584, 610. Notably, this significant overhaul in the statutory definition of sodomy occurred at the same time that the legislature amended the rape statute, reaffirming that the crime of rape specifically required a "male person" to have "sexual intercourse with a female." *See id.* The amended sodomy statute, which appeared immediately following the rape statute, was more precise in its definition, providing that the crime of sodomy occurred when a person "engages in *any* sexual act involving the genitals of one person and the mouth or anus of another person,

regardless of the sex of either participant." *See id.* (emphasis added).

¶36     In short, when creating the child sexual offenses of rape and sodomy, the legislature did not alter the conduct elements of what had previously been rape and sodomy. Instead, the new statutes merely transplanted the meaning of the offenses as originally contemplated to the new child-specific statutes. *See generally In re Childers-Gray*, 2021 UT 13, ¶ 50. Thus, the rape of a child statute brought with it the vaginal sex meaning of the existing adult rape statute, and the sodomy on a child statute brought with it the oral sex and anal sex meaning from the existing adult sodomy statute.

¶37     Based on the foregoing, we hold that the term "sexual intercourse" as used in the rape of a child statute is limited to vaginal sex. Acts involving oral sex or anal sex do not qualify as "sexual intercourse" and therefore are not sufficient to satisfy the sexual intercourse element of rape of a child.[9]

---

9. To the extent that other provisions of the criminal code arguably could be used to discern the legislature's intent as to whether "sexual intercourse" means only vaginal sex as opposed to sodomy, *see, e.g.*, Utah Code § 76-5-401 (unlawful sexual activity with a minor); *id.* § 76-5-401.1 (sexual abuse of a minor); *id.* § 76-5-401.2 (unlawful sexual conduct with a 16- or 17-year-old), those provisions are less informative because they were enacted after the child rape and sodomy statutes. *Cf. State v. Wilkerson*, 2020 UT App 160, ¶ 16, 478 P.3d 1048 ("It is unreasonable to conclude that our legislature, in enacting the Pay-to-Stay Statute in 2003, intended to incorporate a specialized definition of 'incarceration' that it would not codify, even in a different context, for another seven years. Had our legislature intended the 2010 definition of 'incarceration' used in the factual innocence statute to apply to the previously enacted Pay-to-Stay Statute, we are confident it would have said so more clearly.").

B. The evidence presented at trial was not sufficient to prove that C.N. engaged in sexual intercourse with Seth.

¶38 Having concluded the term "sexual intercourse" is limited to only vaginal sex, we next determine whether the State presented sufficient evidence from which the juvenile court could find beyond a reasonable doubt that C.N. engaged in sexual intercourse with Seth. "When reviewing a juvenile court's decision for sufficiency of the evidence, we must consider all the facts, and all reasonable inferences which may be drawn therefrom, in a light most favorable to the juvenile court's determination." *In re J.E.G.*, 2020 UT App 94, ¶ 22, 468 P.3d 1048 (quotation simplified). In so doing, we do not "reweigh the evidence presented," *State v. Wall*, 2020 UT App 36, ¶ 53, 460 P.3d 1058, *cert. denied*, 470 P.3d 444 (Utah 2020), or "examine whether we believe that the evidence at trial established guilt beyond a reasonable doubt," *Salt Lake City v. Carrera*, 2015 UT 73, ¶ 10, 358 P.3d 1067 (quotation simplified). Rather, we determine only if "the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt" that the juvenile is delinquent. *See id.* (quotation simplified).

¶39 The juvenile court's decision "relie[d] in large measure upon [Seth's] testimony, particularly the testimony which was elicited during his CJC interview."[10] During his CJC interview, Seth consistently described the interaction with C.N. as involving her "butt" and his "middle part." Seth explained that when he put his "thingy in [C.N.'s] butt," he "felt her butt hole," which was "soft." Seth also said that while his "thingy was still in [C.N.'s] butt," she "moaned once," "for like one minute and like five

---

10. The State contends the juvenile court could also have relied on the testimonies of other witnesses—specifically Officer, Sally, and Abby—to support the conclusion that C.N. engaged in sexual intercourse with Seth. But none of the information provided by the other witnesses includes additional evidence that would support the court's conclusion.

seconds." And Seth also consistently described the positioning between himself and C.N. during the touching. He maintained that C.N. was positioned with "her hands and her knees on the bed" and Seth was "on [his] knees" "behind her." Seth could see C.N.'s "butt hole" and "her butt." Seth explained that his "middle part" was "sticking up" and "pointing" "[b]ehind [C.N.'s] butt," and that when his "thingy was . . . in her butt," they "looked like an animal connected together" with "a stick in the middle"; the "stick" was his "middle part." After reviewing this testimony, the court found that Seth was "a credible witness" and therefore concluded "the allegation is true."

¶40   C.N. argues Seth's testimony was insufficient to support her adjudication for rape of a child because the touching described by Seth does not satisfy the element of sexual intercourse. C.N. does not challenge Seth's credibility but instead contends the court's conclusion that sexual intercourse had occurred was based on impermissible speculation rather than permissible inference. Specifically, C.N. contends the court's conclusion was based on speculation because Seth was "consistent and exclusive in his use of the word 'butt'" and "the ordinary meaning of the word[] used does not support that he and C.N. engaged in sexual intercourse."

¶41   "Sex crimes are defined with great specificity and require concomitant specificity of proof." *State v. Pullman*, 2013 UT App 168, ¶ 14, 306 P.3d 827. Where the evidence does not explicitly establish an element of the crime, guilt may still be found if the factfinder concludes the evidence supports a reasonable inference that the defendant committed the challenged element. *See State v. Patterson*, 2017 UT App 194, ¶¶ 13–14, 407 P.3d 1002, *cert. denied*, 417 P.3d 580 (Utah 2018). "[T]he difference between an inference and speculation depends on whether the underlying facts support the conclusion." *Carrera*, 2015 UT 73, ¶ 12. "An inference is a conclusion reached by considering other facts and deducing a logical consequence from them whereas speculation is the act or practice of theorizing about matters over which there is no certain

knowledge." *Patterson*, 2017 UT App 194, ¶ 14 (quotation simplified).

¶42 Seth's testimony clearly indicates that C.N. unlawfully touched him.[11] But his testimony does not adequately describe the challenged element of the offense of rape of a child—"sexual intercourse"—which occurs only when the conduct includes vaginal sex. *See Pullman*, 2013 UT App 168, ¶¶ 12–16 (reversing the defendant's conviction for sodomy on a child because although the child victim's testimony "described a sexual act involving [the defendant's] penis and her buttocks," it did not establish the defendant had in fact "touch[ed]" her anus, as required to satisfy a statutory element of the crime (emphasis omitted)). Because Seth's testimony does not explicitly establish that C.N. and Seth engaged in sexual intercourse, the question becomes whether the juvenile court's conclusion can be reasonably inferred from the evidence.

¶43 Here, Seth's testimony was clear and consistent, and the court found him to be a "credible witness." Throughout his testimony, Seth consistently described C.N.'s sexual assault as involving her "butt" and his "middle part." Indeed, he testified he saw C.N.'s "butthole." However, no one asked him to clarify what he meant or whether he, now twelve years old, could

---

11. Although the State chose not to do so, based on the evidence presented at trial—including C.N.'s concession that "there was some touching going on" between C.N. and Seth—it could have charged C.N. with sodomy on a child, which requires a "sexual act" rather than "sexual intercourse." *Compare* Utah Code § 76-5-403.1(2)(a) ("An actor commits sodomy on a child if: (i) the actor engages in any sexual act upon or with another individual; (ii) the individual is younger than 14 years old; and (iii) the sexual act involves the genitals or anus of the actor or the individual and the mouth or anus of either the actor or individual."), *with id.* § 76-5-402.1(2)(a) ("An actor commits rape of a child if the actor has sexual intercourse with an individual who is younger than 14 years old.").

differentiate between a vagina and an anus. Accepting his testimony as true, which the court did, there is little evidence that the touching between Seth and C.N. involved Seth's penis and C.N.'s vagina. In concluding otherwise, the court took an impermissible "speculative leap." *See State v. Shumway*, 2002 UT 124, ¶ 15, 63 P.3d 94 (quotation simplified).

¶44 The State resists this conclusion, arguing that a "child-rape victim's age-appropriate descriptions of sexual touching and use of technically incorrect words or generic terms to identify genitalia . . . is sufficient to prove sexual intercourse 'so long as the child's meaning is clear.'" (Quoting *State v. Peterson*, 2015 UT App 129, ¶ 3, 351 P.3d 812, *cert. denied*, 362 P.3d 1255 (Utah 2015).) Although the State's assertion is correct, that is not what happened here.

¶45 In *Peterson*, the defendant challenged his convictions for aggravated sexual abuse of a child, rape of a child, and object rape of a child on sufficiency grounds. 2015 UT App 129, ¶¶ 1, 3. There, the child victim testified the defendant "touched her 'private' with his finger underneath her underwear" and that his finger "went in her private." *Id.* ¶ 4 (quotation simplified). The defendant argued the child victim's "general reference to her private, as opposed to her vagina, was insufficient to establish penetration" of the child's genital, a required element of the offense. *Id.* This court disagreed, concluding that "in sexual abuse cases, child witnesses frequently refer to genitalia as 'privates'; a child's failure to use an anatomical reference does not make [the child's] testimony insufficient, so long as the child's meaning is clear." *Id.* ¶ 5. The court found it significant that at trial, the child victim "explained that by 'private,' she meant her 'front' private used for '[g]oing to the bathroom' and distinguished it from her 'bottom.'" *Id.* ¶ 4. This clarification "sufficiently indicated that [the child] was referring to her vaginal opening." *Id.* ¶ 5.

¶46 Conversely, in this case, Seth did not use a "general reference" to C.N.'s genitalia. *See id.* ¶ 4. Instead, Seth consistently used an anatomical reference, repeatedly testifying that he

inserted his "middle part" into C.N.'s "butt." And while the law does not require a child victim to use anatomically correct references when describing abuse, the testimony is sufficient only "so long as the child's meaning is clear." *See id.* ¶ 5. Here, nothing specifically indicates that Seth's numerous references to C.N.'s "butt" and "butt hole" were actually references to C.N.'s vagina. Because Seth's testimony was both specific and consistent in its language, we cannot assign it a different meaning altogether.

¶47 In sum, the touching described by Seth during his CJC interview and at trial was not sufficient to prove that C.N. engaged in sexual intercourse with Seth. Because sexual intercourse is an essential element of the crime of rape of a child, C.N.'s adjudication was not supported by sufficient evidence.[12]

CONCLUSION

¶48 The term "sexual intercourse" as used in the rape of a child statute is limited to only vaginal sex. Because the State did not present sufficient evidence to the juvenile court to prove beyond a reasonable doubt that C.N. engaged in vaginal sex with Seth, we reverse her adjudication for rape of a child.

––––––––––

12. In the alternative, the State argues that if we conclude the evidence was insufficient to support C.N.'s adjudication for rape of a child, we should "set aside C.N.'s adjudication of rape of a child and enter judgment for the lesser included offense of attempted rape of a child." We decline to do so, however, given the lack of evidence that C.N. intended to engage in sexual intercourse with Seth. *See State v. Casey*, 2003 UT 55, ¶ 13, 82 P.3d 1106 ("Attempt crimes are derivatives of completed crimes, and the express language of both the completed crime statute and the attempt statute determines the elements of the attempt crime."); *id.* ¶ 38 ("[I]ntent is required to convict someone of an attempt crime.").